**FARMERS' GRAIN CO. OF EMBDEN v. LANGER, Attorney General of North Dakota, et al.**

(Circuit Court of Appeals, Eighth Circuit. May 3, 1921.)

No. 5728.

1. Courts ⬅405(6)—Circuit Court of Appeals has jurisdiction to review decree in suit to enjoin enforcement of state statute as in conflict with law of United States.

The decree in a suit in a District Court to enjoin enforcement of a state statute on the ground that it is in violation of the Constitution of the United States as imposing a burden on interstate commerce and also on the ground that it is in conflict with a law of the United States, *held* not one which the Supreme Court has exclusive jurisdiction to review under Judicial Code, § 238 (Comp. St. § 1215), but reviewable on appeal by the Circuit Court of Appeals.

2. Commerce ⬅33—Purchase of grain for interstate shipment is a part of the interstate commerce.

Purchases of grain by elevators in North Dakota for shipment to terminal markets in another state, where 90 per cent. of the annual crop of the state is marketed, and with reference to which the prices paid by the elevators are fixed, are a part of the unit of interstate commerce involved in the shipments.

3. Commerce ⬅50—State statute invalid, as imposing burden on interstate commerce.

Laws N. D. 1919, c. 138, providing for the appointment of a state inspector of grades, weights and measures, with power to establish grades for grain, seeds, and other agricultural products, at which the same shall be bought and sold, to issue licenses to persons engaged in buying grain as deputy inspectors, to fix charges for grading, inspecting, and weighing grain, and to "establish a reasonable margin to be paid producers of grain by warehousemen, elevators, and mills," and requiring all buyers of

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

grain to procure licenses and pay an annual fee of $10 therefor, and that all grain shall be inspected and graded when offered to them for sale or shipment, *held* unconstitutional, as imposing a direct burden on interstate commerce, in view of United States Grain Standards Act (Comp. St. §§ 8747½–8747½k), which covers the subject of inspecting and grading grain shipped in interstate commerce.

**4. Commerce ⌖8(1)—State grain inspection law held invalid as in conflict with federal statute.**

Laws N. D. 1919, c. 138, authorizing the state inspector of grades, weights, and measures to establish grades for grain and to appoint as deputy inspectors owners of elevators and other buyers of grain, who are required to inspect and grade all grain offered to them for sale or shipment, *held* invalid, as in conflict with United States Grain Standards Act (Comp. St. §§ 8747½–8747½k), under which uniform grades are established and all grain shipped in interstate commerce is required to be inspected and graded, either at the point where shipped or where marketed, or at some intermediate point, by a government inspector, who shall not be interested directly or indirectly in the merchandising of grain, in accordance with which grading the grain shall be marketed.

Appeal from the District Court of the United States for the District of North Dakota; Charles F. Amidon, Judge.

Suit in Equity by the Farmers' Grain Company of Embden against William Langer, as Attorney General of the State of North Dakota, and others. Decree for defendants, and complainant appeals. Reversed.

David F. Simpson, of Minneapolis, Minn. (Sveinbjorn Johnson, of Grand Forks, N. D., and William A. Lancaster, John Junell, James E. Dorsey, and Harold G. Simpson, all of Minneapolis, Minn., on the brief), for appellant.

Seth W. Richardson, of Fargo, N. D. (William Lemke, of Bismarck, N. D., on the brief), for appellees.

Before CARLAND, Circuit Judge, and LEWIS and COTTERAL, District Judges.

CARLAND, Circuit Judge. Appellant commenced this action for the purpose of having chapter 138, Laws North Dakota of 1919, adjudged to be null and void, as imposing a direct burden upon interstate commerce, and as being in conflict with the United States Grain Standards Act (39 Stat. 482 [Comp. St. §§ 8747½–8747½k]), and for the further purpose of having appellees, their agents, servants, and employees, perpetually enjoined from enforcing the same. The case was heard on pleadings and proofs, and as a result thereof the action was dismissed on the merits. Appellant appealed.

[1] Counsel for appellees have moved to dismiss the appeal for want of jurisdiction. The parties are all citizens of North Dakota and the jurisdiction of the District Court was invoked upon the ground that the suit arose under the Constitution and a law of the United States. If the jurisdiction of the District Court to entertain the suit had been based alone upon the ground that it was one arising under the Constitution of the United States, then the jurisdiction of the Supreme Court to review the case on appeal would have been ex-

clusive. Judicial Code, §§ 128–238 (Comp. St. §§ 1120–1215); Raton Waterworks Co. v. City of Raton, 249 U. S. 552, 39 Sup. Ct. 384, 63 L. Ed. 768; American Sugar Refining Co. v. New Orleans, 181 U. S. 277, 281, 21 Sup. Ct. 646, 45 L. Ed. 859; Huguley Manufacturing Co. v. Galeton Cotton Mills, 184 U. S. 209, 295, 22 Sup. Ct. 452, 46 L. Ed. 546; Union & Planters Bank v. Memphis, 189 U. S. 71, 73, 23 Sup. Ct. 604, 47 L. Ed. 712; Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253; Carolina Glass Co. v. South Carolina, 240 U. S. 305, 318, 36 Sup. Ct. 293, 60 L. Ed. 658. The jurisdiction of the District Court, however, as above stated, was based upon two grounds: (a) The construction or application of the Constitution of the United States. (b) A suit arising under a law of the United States. Grain Standards Act, supra. In such a case the jurisdiction of the Supreme Court to hear an appeal from the judgment below is not exclusive, and the appeal in this case was properly taken to this court. Spreckles Sugar Refining Co. v. McClain, 192 U. S. 397, 24 Sup. Ct. 376, 48 L. Ed. 496. The Spreckles Case was one arising under both the Constitution and the laws of the United States. It arose under the Constitution, because the plaintiff's cause of action as stated in its complaint was based upon the proposition that the law under which the defendant proceeded to collect the taxes in controversy in that case was contrary to the Constitution. It also arose under a law of the United States, because the plaintiff pleaded that, if the statute was not unconstitutional, still it did not authorize the collection of the taxes in question. The Supreme Court in reference to this matter said:

"But the case distinctly presented other questions which involved simply the construction of the act, and those questions were disposed of by the Circuit Court at the same time it determined the question of the constitutionality of the act. If the case had depended entirely on the construction of the act of Congress—its constitutionality not being drawn in question—it would not have been one of those described in the fifth section of the act of 1891, and, consequently, could not have come here directly from the Circuit Court. As, then, the case, made by the plaintiff, involved a question other than those relating to the constitutionality of the act and to the application and construction of the Constitution, the Circuit Court of Appeals had jurisdiction to review the judgment of the Circuit Court, although if the plaintiff had elected to bring it here directly, this court would have had jurisdiction to determine all the questions arising upon the record. The plaintiff was entitled to bring it here directly from the Circuit Court, or, at its election, to go to the Circuit Court of Appeals for a review of the whole case."

Some confusion has existed in some of the decided cases owing to a failure to appreciate what the Supreme Court meant in the Spreckles Case by the words "other questions." It will be observed in that case that the "other questions" beside the constitutional question was the construction of a law of the United States which was also a ground of jurisdiction in the lower court. So that it is not true that merely because a case involves other questions than a constitutional question that the case may be brought to this court on appeal or writ of error. In what we now say upon the question of jurisdiction we put to one side all cases where the jurisdiction of the lower court is based upon a diversity of citizenship and confine our remarks to those cases where

the jurisdiction of the court below is based upon what is generally termed, a federal question. What is meant by "other questions" in the Spreckles Case is well illustrated by the case of Raton Waterworks Co. v. City of Raton, supra. On the face of the opinion in that case the question decided was one which the Supreme Court had decided several times before. The facts as they appeared in the certificate of this court, when taken together with the decision of the Supreme Court, illustrate what is meant by the words "other questions." In the Raton Case the waterworks company commenced an action against the city of Raton for the purpose of enjoining the city from constructing a system of waterworks of its own before the expiration of the franchise granted by the city to the waterworks company on the ground that the ordinance providing for the construction of the city system, having been passed in pursuance of authority granted by the Legislature of New Mexico, was a law which impaired the obligation of the contract between the city and the waterworks company. Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341. This and other constitutional questions were the sole grounds of jurisdiction upon which the action was based. The contract or franchise made between the city and the waterworks company contained a provision to the effect that, if the waterworks company should fail at any time for a certain period to furnish good and potable water to the city, the city should have the right to terminate the contract. The city pleaded this provision as a defense to the action of the waterworks company. On the trial much evidence was taken upon this defense. The trial court sustained the defense made by the city and rendered judgment against the waterworks company; the constitutional question serving no purpose except as a ground of jurisdiction.

The Supreme Court in the case of Vicksburg v. Vicksburg Waterworks Co., 202 U. S. 453, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253, had decided that where complainant's bill disclosed an intention by a municipality to deprive complainant, a water supply company, of rights under an existing contract by subsequent legislation, and the city could not show any inherent want of legal validity in the contract, or any such disregard of its obligations by complainant as would absolve the city therefrom, the case was one arising under the Constitution of the United States, and that a direct appeal would lie to the Supreme Court. The facts in the Raton Case brought it within the rule stated in the Vicksburg Case. An appeal was taken to this court, and, there being doubt about our jurisdiction, the question was certified to the Supreme Court. It thus appears that, while there was another question in the Raton Case besides the constitutional one, still the Supreme Court decided that the jurisdiction of the Supreme Court to review the judgment was exclusive, thus showing, it seems to us, that the "other questions" mentioned in the Spreckles Case mean questions based upon some jurisdictional ground. We are unable to find that the Spreckles Case has been modified in any way by the Supreme Court, and it was cited with approval in City of Pomona v. Sunset Telephone & Telegraph Co., 224 U. S. 330, 342, 32 Sup. Ct. 477, 56 L. Ed. 788.

Whether or not the North Dakota law conflicts with the Grain Standards Act requires the construction of both laws. If the jurisdiction in the court below had been rested alone upon the Grain Standards Act, an appeal could not have been taken to the Supreme Court, but of necessity would have been taken to this court. We are therefore clearly of the opinion that the jurisdiction of the Supreme Court to review the judgment below in this case was not exclusive, and that this court has jurisdiction of the whole case.

Coming to the merits, the facts are as follows: The spring wheat crop of North Dakota varies from 100,000,000 to 156,000,000 bushels annually. Approximately 90 per cent. of this wheat is bought for shipment and actually shipped to terminal markets outside of the state, principally Minneapolis and Duluth, Minn. Approximately 2,200 elevators have been built, connected with railroad tracks at all stations within the grain-growing area of North Dakota, by men and companies engaged in handling this grain. Appellant is a Farmers' Co-operative Elevator Company. It buys grain from its members and other farmers at Embden, N. D., and either loads it directly into cars from the farmers' wagons or assembles it in its elevator and then loads it into cars from its elevator. The grain is shipped at once to Minneapolis or Duluth, and there sold through a commission merchant. The appellant buys grain at Embden at the Minneapolis or Duluth price and sells it at the same price. It retains no profits. If there is a surplus over operating expenses at the end of the season, such surplus is distributed among the farmers pro rata, according to the amount sold by each respectively. During the fiscal year 1920, appellant shipped and sold 57 carloads of wheat, all but one of which were shipped and sold out of the state of North Dakota. The state inspector of grades, weights, and measures of North Dakota testified as follows:

"Q. You know, also, and that is true, I presume (if I am not correct, you will make the correction), that these elevators that buy grain in this state, substantially all of them, buy that wheat for the purpose of marketing it again at the primary markets outside of the state of North Dakota? A. It is common knowledge that they do so; yes.

"Q. That so far as the elevators are concerned, after they have purchased the grain from the producer, there is no market for that grain in the state of North Dakota, but they must find their market outside; that is correct, is it not? A. Yes; that is, for the majority of it."

This testimony is not disputed. The course of interstate commerce in wheat and other grains is from the farmer's wagon to cars, or through the elevator into railway cars, and on to the terminal markets above mentioned. Inspection and grading under the state statute lays hold on it at the very inception of this movement, and if the requirements of that statute are not complied with by the owner of the elevator the movement is prohibited and stopped. August 11, 1916, Congress passed the United States Grain Standards Act. 39 Stat. 482. Section 2 of the act contains the following language:

"Sec. 2. That the Secretary of Agriculture is hereby authorized to investigate the handling, grading, and transportation of grain and to fix and establish as soon as may be after the enactment hereof standards of quality and condition for corn (maize), wheat, rye, oats, barley, flaxseed, and such

other grains as in his judgment the usages of the trade may warrant and permit, and the Secretary of Agriculture shall have power to alter or modify such standards whenever the necessities of the trade may require."

Section 4 reads as follows:

"Sec. 4. That whenever standards shall have been fixed and established under this act for any grain no person thereafter shall ship or deliver for shipment in interstate or foreign commerce any such grain which is sold, offered for sale, or consigned for sale by grade .unless the grain shall have been inspected and graded by an inspector licensed under this act and the grade by which it is sold, offered for sale, or consigned for sale be one of the grades fixed therefor in the official grain standards of the United States: Provided, that any person may sell, offer for sale, or consign for sale, ship, or deliver for shipment in interstate or foreign commerce any such grain by sample or by type, or under any name, description, or designation which is not false or misleading, and which name, description, or designation does not include in whole or in part the terms of any official grain standard of the United States: Provided further, that any such grain sold, offered for sale, or consigned for sale by grade may be shipped or delivered for shipment in interstate or foreign commerce without inspection at point of shipment by an inspector licensed under this act, to or through any place at which an inspector licensed under this act is located, subject to be inspected by a licensed inspector at the place to which shipped or at some convenient point through which shipped for inspection, which .inspection shall be under such rules and regulations as the Secretary of Agriculture shall prescribe, and subject further to the right of appeal from such inspection, as provided in section 6 of this act: And provided further, that any such grain sold, offered for sale, or consigned for sale by any of the grades fixed therefor in the official grain standards may, upon compliance with the rules and regulations prescribed by the Secretary of Agriculture, be shipped in interstate or foreign commerce without inspection from a place at which there is no inspector licensed under this act to a place at which there is no such inspector, subject to the right of either party to the transaction to refer any dispute as to the grade of the grain to the Secretary of Agriculture, who may determine the true grade thereof. No person shall in any certificate or in any contract or agreement of sale or agreement to sell by grade, either oral or written, involving, or in any invoice or bill of lading or other shipping document relating to, the shipment or delivery for shipment, in interstate or foreign commerce, of any grain for which standards shall have been fixed and established under this act describe, or in any way refer to, any of such grain as being of any grade other than a grade fixed therefor in the official grain standards of the United States."

The first and second provisos of section 7 read as follows:

"Provided, that in any state which has, or which may hereafter have a state grain inspection department established by the laws of such state, the Secretary of Agriculture shall issue licenses to the persons duly authorized and employed to inspect and grade grain under the laws of such state. * * *

"Provided further, that no person licensed by the Secretary of Agriculture to inspect or grade grain or employed by him in carrying out any of the provisions of this act shall, during 'the term of such license or employment, be interested, financially or otherwise, directly or indirectly, in any grain elevator or warehouse, or in the merchandising of grain, nor shall he be in the employment of any person or corporation owning or operating any grain elevator or warehouse."

Pursuant to the authority conferred by the act, the Secretary of Agriculture established official grain standards for wheat, shelled corn, and oats. Service and Regulatory Announcements, Nos. 33 and 46. In 1919 the Legislature of North Dakota passed a grain grading and

inspection statute, being chapter 138, Laws 1919, which is the law attacked by appellant in this action. This law authorized the Governor of North Dakota to appoint a state inspector of grades, weights, and measures, who by section 2 of the law was given the power and by said law was directed,

"(b) To issue licenses to warehouses, buyers and solicitors of grain, seeds and other agricultural products;·

"(c) To establish uniform grades for grain, seeds or other agricultural products for the state of North Dakota with power to alter and modify such grades;

"(d) To establish uniform grade certificates used in the marketing of grain, seeds, or other agricultural products;

"(e) To hear and determine appeals from the decision of state deputy inspectors and from deputy inspectors of grades, weights and measures;

"(f) To conduct investigations into all matters directly or indirectly connected with or bearing upon the marketing, grading and weighing of all grain."

"(i) To establish a reasonable margin to be paid producers of grain by warehouses, elevators and mills;

"(j) To fix and determine all charges for grading, inspecting and weighing grain or other agricultural products;

"(k) To make rules and regulations for the purpose of carrying out the provisions of this act and to do any and all things necessary or expedient for said purpose."

## Sections 3, 4, 5, 6, 7, and 8 of said law reads as follows:

"Sec. 3. It shall be the duty of the inspector of grades, weights and measures to proceed at once to define and establish uniform grades and weights for grain, seeds or other agricultural products, also for flour meal and products made therefrom, either singly or combined. In establishing such grades, dockage shall be considered as being of two classes, first, that having value, and second, that having no value, the former to be considered and paid for at its market value.

"Sec. 4. The term 'deputy inspector of grades, weights and measures' within the meaning of this act is defined as any firm, person, company, corporation or association that buys, weighs and grades grain, seeds or other agricultural products and holds a license issued therefor by the state inspector of grades, weights and measures.

"Sec. 5. The term 'state deputy inspector of grades, weights and measures' within the meaning of this act, is defined as one who is in the employment of the state of North Dakota and has received an appointment from the state inspector of grades, weights and measures.

"Sec. 6. The term 'solicitor of grain, seed and other agricultural products' within the meaning of this act is defined as one who engages in the business of soliciting grain, seed and other agricultural products to be sold for the benefit of the consignee or otherwise disposed of for the benefit of himself, an agent, broker or factor.

"Sec. 7. The term 'public warehouse,' within the meaning of this act, is defined as all buildings, elevators or warehouses, and all grist and flour mills doing a shipping business in this state, erected or operated or which may hereafter be erected or operated by any person, association, copartnership, corporation or trust for the purpose of buying, selling, storing, shipping or handling grain for profit.

"Sec. 8. The chief deputy inspector of grades, weights and measures and chief elevator accountant shall have power and authority under the direction of the state inspector of grades, weights and measures to carry out the provisions of this act. They shall be stationed at the North Dakota Agricultural College."

273 F.—41

Section 10 contains the following language:

"Sec. 10. It shall be the duty of deputy inspectors of grades, weights and measures to weigh, inspect and grade all grain, seeds and other agricultural products that shall be offered for sale or shipment at their market place, according to the provisions of this act and the rules and regulations established by the state inspector of grades, weights and measures."

Section 11 contains the following language:

"Sec. 11. The state inspector of grades, weights and measures may issue a license to any person engaged in buying, weighing and inspecting or grading grain, seed or other agricultural products or the buyer or agent of a privately or publicly owned warehouse, elevator or flour mill. * * * The condition of such license shall require such deputy inspectors of grades, weights and measures to fix grades and dockage of grain and seeds inspected at their respective places of business and correctly weigh the products so inspected and graded according to the provisions of this act and the rules and regulations made hereunder. The state inspector of grades, weights and measures may issue a license to any person engaged in soliciting or procuring consignments of grain, seeds. * * * The condition of such license shall require such solicitor to comply with the provisions of this act and all rules and regulations established by the state inspector of grades, weights and measures. The state inspector of grades, weights and measure may suspend or revoke any license issued by him under this act whenever after investigation he shall determine that such licensee is incompetent or has knowingly or carelessly graded grain improperly or has issued any false certificate of grading or has violated any provision of this act or the rules and regulations made hereunder."

Section 14 contains the following language:

"Sec. 14. It shall be unlawful for any person to buy or grade grain, seeds or other agricultural products who is not licensed as a deputy inspector of grades, weights and measures. It shall be unlawful for any person or persons, corporation or association operating a public warehouse to purchase, weigh, grade or inspect grain, seeds or other agricultural products without first procuring a deputy inspector of grades, weights and measures' license."

Section 16 reads as follows:

"Sec. 16. The state inspector of grades, weights and measures, may upon the cancellation or suspension of any license issued hereunder permit the business of any licensee to be completed and finally closed under the inspection and supervision of a state deputy inspector who shall be stationed at the place of business of such licensee. All the expenses of such inspection and supervision shall be paid by such licensee."

Section 18 contains the following language:

"Sec. 18. The state inspector of grades, weights and measures may establish central markets for the display of samples of grain, seeds or other agricultural products and may install a deputy in charge of any such central market at cities, or towns without or within the state of North Dakota."

Section 20 contains the following language:

"Sec 20. It shall be the duty of all deputy inspectors of grades, weights and measures to keep a record showing the name and addresses of patrons of their respective warehouses, elevators or mills; the prices paid for agricultural products; the grades given; the prices received and the grades received at terminal markets or within the state."

Section 23 reads as follows:

"Sec. 23. The state inspector of grades, weights and measures is hereby authorized, upon complaint of a producer of grain, seeds or other agricultural

products that any warehouse, elevator or mill is paying an unreasonable margin, to investigate, determine and establish reasonable margin to be paid such producer for grain, seeds or other agricultural products."

Under this statute the North Dakota inspector of grades, weights and measures established North Dakota standards for grading wheat, corn, and oats identical with the federal standards effective June 16, 1919. In establishing these standards the Inspector used the following language:

"The federal government has established grades for corn, all classes of wheat and oats, so that all interstate shipments must be graded according to these standards. In order to avoid the confusion of a double standard and a dual inspection, we deem it advisable to adopt these standards; the said grain standards published in the government service and regulatory announcements are hereby adopted and made part of the North Dakota grades."

The North Dakota law provided for a fee of $10 for each license to be paid to the inspector. No person can purchase wheat in North Dakota, without he obtains the license provided by law, and must promise in his application for such license that he will grade wheat and other grains according to the North Dakota law. The conceded purpose, force, and effect of the state statute is to regulate and control the marketing and distribution of the grain crop of North Dakota. The appellees are the Attorney General of North Dakota, the state inspector of grades, weights and measures, the chief deputy state inspector of grades, weights and measures, and William C. Green, state's attorney of Cass county, N. D. Appellant did not comply with the North Dakota statute, and the revocation of its license and the taking over of its elevator was threatened when this action was brought. The license referred to was obtained by one Gebhart, in the employ of appellant. The appellant refused to pay for dockage or to deliver dockage separated from the grain to the seller.

Three questions of law arise upon the record: (1) Is the purchase of grain in the state of North Dakota for shipment out of the state, as detailed in the evidence, a part of the interstate commerce involved in the shipment? (2) If the foregoing question shall be answered in the affirmative, does chapter 138, Session Laws North Dakota of 1919, impose a direct and unreasonable burden upon that interstate commerce? (3) Is said law in conflict with the United States Grain Standards Act to such an extent as to render it void?

[2] As to the first proposition, the trial court decided that the grain of North Dakota under the facts in the case did not become an article of interstate commerce until actually delivered to the carrier for transportation; that the intention of the owner to transfer the grain to another state, or his appropriation of it for such transportation, did not make it an article of interstate commerce, and therefore the state of North Dakota, under its police power, could lawfully enact the statute complained of—it having only to do with the grain before the commencement of its transfer to another state. With reference to the question of intention, counsel for appellant make no claim that mere intention to transport the grain to another state makes it an article of interstate commerce; but the claim is that, as it appears from

the record that approximately 90 per cent. of the grain annually raised in North Dakota must be and is purchased for shipment out of the state, such course of commerce is a fact, and not a matter of intention; that this course of commerce is a unit, and may not be unreasonably burdened by the state.

There are many decisions of the courts defining the words "commerce" and "interstate commerce"; but it is generally conceded that no arbitrary rule can be laid down as to what is commerce, or interstate commerce, but that each case as it arises must be determined by its own facts. As was said in Public Utilities Comm. v. Landon, 249 U. S. 245, 39 Sup. Ct. 269, 63 L. Ed. 577:

"Interstate commerce is a practical conception, and what falls within it must be determined upon consideration of established facts and known commercial methods. Rearick v. Pennsylvania, 203 U. S. 507, 512; The Pipe Line Cases, 234 U. S. 548, 560."

In the early history of the interpretation of the commerce clause of the Constitution, it was first contended that commerce did not include transportation or navigation, but was confined solely to traffic, buying and selling. This contention, however, was decided to be unsound in Gibbons v. Ogden, 9 Wheat. 229, 6 L. Ed. 23. At this day it seems strange that such a contention was ever made, as now the great and important element in commerce is transportation or navigation. It was next contended that a sale of goods within a state after their transportation into that state was not a part of interstate commerce, but this contention was also decided to be unsound in Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678. In principle it is difficult to conceive any valid distinction between a sale following transportation and a purchase preceding it. It is noteworthy that Mr. Justice Thompson, in his dissenting opinion in Brown v. Maryland, supra, made the same objections in reference to a sale after transportation that is now made in this case to a sale before transportation. In County of Mobile v. Kimball, 102 U. S. 691, 702 (26 L. Ed. 238) it was said:

"Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities."

In Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346, it was said:

"Buying and selling and the transportation incidental thereto constitute commerce."

Not many cases are to be found which have considered the element of purchase in reference to interstate commerce, where a violation of the Constitution was involved.

The Supreme Court has, however, in discussing the application of the Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) and federal pure food legislation (Comp. St. §§ 8717–8728), announced principles which we believe to be applicable to the question now under discus-

sion. In U. S. v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, the court said:

"Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purposes of such transit among the states, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce."

Justice Harlan, dissenting from the majority in the above case, concurred in the above statement of law, and further contended that manufacture before shipment was a part of interstate commerce.

In the case of Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, the Supreme Court said:

"As has frequently been said, interstate commerce consists of intercourse and traffic between the citizens or inhabitants of different states, and includes, not only the transportation of persons and property and the navigation of public waters for that purpose, but also the purchase, sale, and exchange of commodities. Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196–203; Kidd v. Pearson, 128 U. S. 1, 20."

In Swift & Co. v. U. S., 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, it was said:

"Taking up the latter objection first, commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce."

In Oklahoma v. Kansas Natural Gas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193, the Supreme Court held a statute of Oklahoma to be unconstitutional which prohibited the shipment of natural gas in interstate commerce. The court, in discussing the question there involved, remarked:

"And why may not the products of the field be brought within the principle? Thus enlarged, or without that enlargement, its influence on interstate commerce need not be pointed out. To what consequences does such power tend? If one state has it, all states have it; embargo may be retaliated by embargo, and commerce will be halted at state lines. And yet we have said that 'in matters of foreign and interstate commerce there are no state lines.' In such commerce, instead of the states, a new power appears, and a new welfare, a welfare which transcends that of any state. But rather let us say it is constituted of the welfare of all of the states, and that of each state is made the greater by a division of its resources, natural and created, with every other state, and those of every other state with it. This was the purpose, as it is the result, of the interstate commerce clause of the Constitution of the United States. If there be a turning backward, it must be done by the authority of another instrumentality than a court."

In U. S. v. Reading Co., 226 U. S. 324, the court said on page 367, 33 Sup. Ct. 90, 102 (57 L. Ed. 243):

"The coal contracts acquired when this proceeding was begun aggregated nearly one-half the tonnage of the independent operators. Much of the coal so bought was sold in Pennsylvania, and all of the contracts were made in

that state, and the coal was also there delivered to the buying defendants. That the defendants were free to sell again within Pennsylvania, or transport and sell beyond the state, is true. That some of the coal was intended for local consumption may also be true. But the general market contemplated was the market at tidewater, and the sales were made upon the basis of the average price at tidewater. The mere fact that the sales and deliveries took place in Pennsylvania is not controlling, when, as here, the expectation was that the coal would, for the most part, fall into and become a part of the well-known current of commerce between the mines and the general consuming markets of other states."

In Pennsylvania Railroad Co. v. Clark Coal Co., 238 U. S. 456, 35 Sup. Ct. 896, 59 L. Ed. 1406, it was said:

"In the present case, to repeat, it appears that, for the purpose of filling contracts with purchasers in other states, coal is delivered f. o. b. at the mines for transportation to such purchasers. The movement thus initiated is an interstate movement, and the facilities required are facilities of interstate commerce. A very large part of what in fact is the interstate commerce of the country is conducted upon this basis, and the arrangements that are made between seller and purchaser with respect to the place of taking title to the commodity, or as to the payment of freight, where the actual movement is interstate, does not affect either the power of Congress or the jurisdiction of the Commission which Congress has established."

Section 25, C. J. vol. 12, p. 26, reads as follows:

"That intercourse between citizens and inhabitants of different states which constitutes interstate commerce, and which is subject to federal, but not to state, regulation, includes not only the transportation of persons and property, but also the purchase, sale, and exchange of commodities, the very purpose and motive of that branch of commerce which consists in transportation being that other and consequent act of commerce which consists in the sale or exchange of the commodities transported."

This declaration of law is supported by numerous cases cited in the work referred to. In view of the language of the cases cited under the Sherman Act, it is entirely proper to suppose a combination among all the purchasers of grain in the state of North Dakota for shipment beyond the state to control the price on which the surplus grain of North Dakota should be bought and under the rules in the cases referred to, there scarcely could be a doubt but that the combination would come within the federal Anti-Trust Act. As opposed to the proposition that the purchase of grain in North Dakota under the facts as they appear in the record is not interstate commerce or a part of the transportation, cases involving the right of a state where taxes are regularly levied are cited. Such a case is Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, where it was held that logs cut in New Hampshire were still subject to taxation by that state, although they were being assembled at a station for shipment to Maine, and this because such logs were still a part of the general mass of property within the state, and were therefore subject to taxation in the usual manner in common with other property in the state. In Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382, and Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091, 29 L. Ed. 257, it was decided that goods brought into a state, after arriving at their destination, may be taxed by the state in the same manner as other goods in the state, although under the rule of Brown v. Maryland, a state regulation of

the sale of such goods would be void. In Bacon v. Illinois, 227 U. S. 504, 33 Sup. Ct. 299, 57 L. Ed. 615, it was held that grain passing through the city of Chicago and there loaded into an elevator for the purpose of weighing, grading, mixing, etc., became subject to taxation by the state of Illinois. Other cases are cited to the same effect, but in view of what seems to be the established rule that interstate commerce in a case like the one under consideration includes the purchase of goods, we do not think the Supreme Court intended by its decisions in the tax cases to in any way modify the rule which it had established in the cases heretofore cited. Other cases are cited to the effect that the manufacture of goods is not a part of interstate commerce in such goods. There is no occasion in this case to controvert that proposition. Manufacture is a very different element than the purchase of goods for shipment in interstate commerce. The proposition is clearly established by Kidd v. Pearson, supra, U. S. v. E. C. Knight Co., supra, and Addyston Pipe & Steel Co. v. U. S., supra.

One of the cases cited by counsel for appellees is Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724. This case arose under the federal child labor statute. It followed the decisions in the Kidd, Knight, and Addyston Pipe & Steel Cases to the effect that manufacture is not commerce. Applying the rule that each case must be decided according to its own facts, we cannot avoid the conclusion that a purchase of grain in North Dakota for shipment and sale at the terminal markets of Minneapolis and Duluth, Minn., taken in connection with the fact that the seller knows that the grain is sold for shipment out of the state, makes the purchase and sale in the state of North Dakota for shipment and sale at the above terminal markets a unit in interstate commerce. There is evidence in the record given by one of the managers of appellant that he would sell the grain purchased wherever he could get the highest price; but the undisputed course of commerce in grain, continued over a period of years, shows beyond a doubt that the above markets are the markets where the highest price can be obtained and that grain is bought with reference to those markets alone.

[3] Having answered the first proposition in the affirmative, we come to the question as to whether chapter 138, supra, imposes a direct burden upon such interstate commerce. If the purchase of grain as detailed in the evidence is a part of the unit of interstate commerce in that grain, it necessarily follows that said chapter 138 does impose a burden on that commerce. In Stuart v. Palmer, 74 N. Y. 183, 188 (30 Am. Rep. 289) Earl, J., said:

"The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done."

In Montana Co. v. St. Louis Mining, etc., Co., 152 U. S. 170, 14 Sup. Ct. 506, 38 L. Ed. 398, the Supreme Court, in quoting this language, declared that the test was accurate, provided, of course, it is limited to what may be rightfully done, and does not extend to that which is wrongfully, though under pretense of the statute, done. In re Lambert, 134 Cal. 626, 66 Pac. 851, 55 L. R. A. 856, 86 Am. St.

Rep. 296; Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302, 60 Am. St. Rep. 609; Hathorn v. National Carbonic Gas Co., 194 N. Y. 326, 87 N. E. 504, 23 L. R. A. (N. S.) 436, 128 Am. St. Rep. 555, 16 Ann. Cas. 989; State v. Williams, 146 N. C. 618, 61 S. E. 61, 17 L. R. A. (N. S.) 299, 14 Ann. Cas. 562; Stout v. State, 36 Okl. 744, 130 Pac. 553, 45 L. R. A. (N. S.) 884, Ann. Cas. 1916E, 858; Sterritt v. Young, 14 Wyo. 146, 82 Pac. 946, 4 L. R. A. (N. S.) 169, 116 Am. St. Rep. 994.

The law of North Dakota gives to the state inspector of grades, weights and measures the power to establish uniform grades for grain, seeds, or other agricultural products for the state of North Dakota, with power to alter and modify such grades. In the order etablishing official grades for grain in North Dakota effective June 16, 1919, the inspector said that in order to avoid the confusion of a double standard and a dual inspection, he deemed it advisable to adopt the grades established by the federal government for corn and all classes of wheat and oats. The inspector under the law was not obliged to establish these grades. He had the power under the law to establish other grades, and his successor in office may not be of the same opinion as to this duty to establish the federal grades as the grades for North Dakota. So it clearly appears that, although the federal law does not require any inspection and grading of grain in North Dakota, still by virtue of the state law there must be an inspection and grading within the state, and the law gives the power to the inspector to bring about dual inspection and grading. The fact that the present inspector established the federal grade is a mere incident, and does not relieve the law from the charge of creating an additional burden to interstate commerce from those required by the federal law. We think this fact alone is a direct and unreasonable burden upon interstate commerce in grain. The state law further provides that, before any one can purchase a bushel of grain in North Dakota, he must first obtain a license to do so and pay an annual license fee of $10, and he must promise in his application for the license that he will obey and enforce all the provisions of the state law. Can interstate commerce carried on under such conditions be called free? Supposing every state in the Union should pass a similar law, what would become of the United States Grain Standards Act, if in addition to the inspection and grading required thereby each state had an inspection and grading law of its own, to which interstate commerce must be subjected.

The inspection and grading of grain in interstate commerce requires a unit system throughout the United States, and no state has the authority to interfere with such system established by the United States. The state law empowered the state inspector of grades, weights and measures to establish a reasonable margin to be paid by producers of grain, by warehouses, elevators, and mills. The margin as used in the statute means the difference between the Minneapolis or Duluth price for grain and the price paid the producer at the country elevator, with freight from the country elevator to Minneapolis or Duluth added. The power, then, to establish this margin, places the

wheat buyer or elevator in the hands of the inspector. He may establish such a margin as will allow the wheat buyer to make a profit, or he may establish it so that he will make nothing. The inspector for practical purposes controls the price the wheat buyers shall pay for the wheat. It is said the law only empowers the inspector to establish a reasonable margin. This would raise in each particular case, if the wheat buyer was not satisfied with the margin, the question as to what would be reasonable. After a year or two of litigation, the courts might decide what was a reasonable margin; but what would this decision be worth to the wheat buyer with a market continually changing. This is another direct and unreasonable burden upon interstate commerce. The state statute gives the state grain inspector authority to regulate and control the marketing of all grain in North Dakota, including authority to determine the price which must be paid for grain bought in the state. A law which has this effect clearly interferes with interstate commerce. Cooley v. Board of Wardens, 12 How. 299, 319, 13 L. Ed. 996; State Freight Tax, 15 Wall. 232, 21 L. Ed. 146; Hall v. Decuir, 95 U. S. 485, 24 L. Ed. 547; County of Mobile v. Kimball, supra; Gloucester Ferry Co. v. Pennsylvania, supra; In re Schechter (C. C.) 63 Fed. 695; 12 Corpus Juris, p. 12; Haskell v. Cowham, 187 Fed. (8th Circuit) 403, 109 C. C. A. 235; Globe Elevator Co. v. Andrew (C. C.) 144 Fed. 871. In the last case cited a law of Wisconsin requiring all grain sold at Superior in that state to be in accordance with Wisconsin weights and grades was held invalid.

The state law also specifically requires the wheat buyer to pay for the dockage contained in grain at a price to be fixed by the seller, or the return of the dockage itself to the seller, and this the buyer must do or forfeit his license. If the license is canceled, the inspector takes possession of the elevator and operates the same without compensation. The existence of a state power to regulate public warehouses does not establish a state power to directly regulate and control the marketing of grain in interstate commerce, and authorities in support of the power to regulate warehouses are not in point. The two leading cases upon the power to regulate warehouses and the distinction between this power and the power to regulate commerce are Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77, and Wabash, etc., Ry. Co. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244. The principles established by these cases were followed in Budd v. N. Y., 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Brass v. Stoeser, 153 U. S. 391, 14 Sup. Ct. 857, 38 L. Ed. 757; Cargill v. Minnesota, 180 U. S. 452, 21 Sup. Ct. 423, 45 L. Ed. 619; Merchants' Exchange v. Missouri, 248 U. S. 365, 39 Sup. Ct. 114, 63 L. Ed. 300. While the state may regulate warehouses, the Supreme Court in the Minnesota Rate Case, 230 U. S. 352, at pages 398, 399, and 400, 33 Sup. Ct. 729, 739, 740 (57 L. Ed. 1511, 48 L. R. A. [N. S.] 1151, Ann. Cas. 1916A, 18), said:

"The general principles governing the exercise of state authority when interstate commerce is affected are well established. The power of Congress to regulate commerce among the several states is supreme and plenary. It is 'complete in itself, may be exercised to its utmost extent, and acknowledges

no limitations other than are prescribed in the Constitution.' Gibbons v. Ogden, 9 Wheat. 1, 196. * * * It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act. *. * * The principle, which determines this classification, underlies the doctrine that the states cannot under any guise impose direct burdens upon interstate commerce; for this is but to hold that the states are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction, save as it is governed in the manner that the national legislature constitutionally ordains."

It is claimed by counsel for appellees that the case of Merchants' Exchange v. Missouri, supra, compels a decision in their favor in the case at bar. This case arose under a warehouse statute of Missouri. The statute declared that in cities of more than 75,000 inhabitants all buildings used for the storage or transferring of grain of different owners, for a compensation, should be deemed public warehouses, and it prohibited under severe penalties any person, corporation, or association other than a duly authorized and bonded state weigher to issue any weight certificate for grain weighed at any warehouse or elevator in the state where duly appointed and qualified state weighers were stationed or to make any charge for such weighing. The Attorney General of the state instituted a proceeding in the nature of quo warranto against the Merchants' Exchange, a Missouri corporation. The information stated that St. Louis was a city of more than 75,000 inhabitants, that public weighers of grain were maintained there at all public warehouses and elevators in compliance with the Missouri law, and that the Merchants' Exchange in violation thereof and in abuse of their corporate franchise maintained a bureau for weighing grain, granting weight certificates, and making charges therefor. One of the defenses pleaded by the Merchants'.Exchange was that the Missouri statute violated the commerce clause of the Constitution. Of course the mere weighing of grain and granting weight certificates had nothing to do with interstate commerce, and the Supreme Court so decided. There was an additional contention made that the Missouri statute regulating the weighing of grain was superseded by the United States Grain Standards Act, referred to in this opinion. The Supreme Court, in answering this contention, stated that the act related exclusively to the establishment by the Secretary of Agriculture of standards of quality and condition; that it did not in any way refer to the weighing of grain. The language quoted above from section 7 of the Grain Standards Act simply provides for the issuance of a license to the state inspector by the Secretary of Agriculture. Congress did not intend by this provision to constitute the state a partner in regulating interstate commerce. The state inspector becomes a United States inspector, but in North Dakota he can do nothing as such. We see nothing in the Merchants' Exchange Case that affects the present case in any way. We do not stop to consider whether the enactment of the state statute was an exercise of the police power or not, as we are of the opin-

ion that the subject-matter as it affects interstate commerce in grain is within the exclusive jurisdiction of the United States.

[4] There remains to be considered the question as to whether the state law conflicts with the United States Grain Standards Act. As we have said with reference to the question as to whether the law is a burden on interstate commerce, so we say now that if the purchase of grain in North Dakota under the evidence in this case, and the shipment thereof to the terminal markets mentioned for sale, is a unit in interstate commerce, then of course any attempt to regulate that commerce by the state of North Dakota is in direct conflict with the Grain Standards Act, wherein Congress sought to establish a uniform system for the inspection and grading of such grain moving in interstate commerce. Both acts ought not to be and cannot be enforced, without confusion and embarrassment as the state inspector declared. Section 4 of the Grain Standards Act, heretofore quoted, makes it unlawful to ship or deliver for shipment in interstate or foreign commerce any such grain which is sold, offered for sale, or consigned for sale by grade, unless the grain shall have been inspected and graded by an inspector licensed under the act. By the second proviso of said section such grain may be shipped or delivered for shipment in interstate or foreign commerce without inspection at point of shipment by an inspector licensed under the act to or through any place at which an inspector licensed under the act is located, subject to be inspected by a licensed inspector at the place to which shipped or at some convenient point through which shipped for inspection, which inspection shall be under such rules and regulations as the Secretary of Agriculture shall prescribe. This proviso, as we understand it, would authorize a shipment of grain in interstate commerce from a point in North Dakota where there was no licensed inspector under the federal act to Minneapolis or Duluth, in Minnesota, to be there inspected by a federal inspector. The state law, however, declares that one may not even buy a bushel of wheat for shipment in interstate commerce without taking out a license to do so and promising to obey all the provisions of the state law and the regulations of the state inspector, and the wheat purchased must be inspected in North Dakota and again at Duluth or Minneapolis. This brings the two laws clearly in conflict, if they both have to do with interstate commerce.

As we have said before, the state law authorizes the state inspector to establish grades for grain and the Secretary of Agriculture by the Grain Standards Act is vested with the same power. These powers are directly in conflict, if they both relate to interstate commerce in grain. The United States Grain Standards Act provides that no person licensed by the Secretary of Agriculture to inspect or grade grain during the term of such license or employment shall be interested, financially or otherwise, directly or indirectly, in any grain elevator or warehouse, or in the merchandising of grain, nor shall he be in the employment of any person or corporation owning or operating any grain elevator or warehouse. The state law provides that the term "deputy inspector of grades, weights and measures," within the meaning of the law, shall mean any firm, person, company, corporation, or association

that buys, weighs, and grades grain, seeds, and other agricultural products who holds a license issued therefor by the state inspector of grades, weights and measures. Thus one law requires that the inspector shall have no interest in the business and the other law requires that he shall. Which law is to prevail? Certainly the federal law, if the business is interstate commerce. It is useless to discuss further the matter of conflict, for the reason that, if both laws relate to the same subject, the state law attempts to regulate something that the state has no power to regulate, and, Congress having acted, the state law is in direct conflict with the federal law.

It is our opinion that the state law is invalid for the reasons stated, and that the decree below should be reversed, and the case remanded, with directions to the court below to issue a permanent injunction, as prayed in the appellant's complaint.