(PRIZE.)

## The GRAN PARA. The *Consul General of Portugal*, Libellant.

Prizes made by armed vessels which have violated the statutes for preserving the neutrality of the United States, will be restored if brought into our ports.

This Court has never decided that the offence adheres to the vessel under whatever change of circumstances that may take place, nor that it cannot be deposited at the termination of the cruize, in preparing for which it was committed; but if this termination be merely colourable, and the vessel was originally equipped with the intention of being employed on the cruize, during which the capture was made, the *delictum* is not purged.

APPEAL from the Circuit Court of Maryland.

This was a libel filed in the District Court of Maryland, by the Consul General of Portugal, alleging that a large sum of money in silver and gold coins had been, in the year 1818, taken out of the Portuguese ship Gran Para, then bound on a voyage from Rio Janeiro to Lisbon, by a private armed vessel called the Irresistible, which had been fitted out in the United States, in violation of the neutrality acts; that the said sum of money had been brought within our territorial jurisdiction, and deposited in the Marine Bank of Baltimore; and praying that the same might be restored to the original Portuguese owners. A claim was filed by one Stansbury, as agent for John D. Daniels, master and owner of the Irresistible, stating him to be a citizen of the Oriental Republic, which was at war with Portugal, and that he was cruizing under the flag

and commission of that republic at the time the capture was made, as set forth in the libel, and insisting on his title to the money as lawful prize of war. By the proofs taken in the cause it appeared that the capturing vessel was built in the port of Baltimore, in the year 1817, and was, in all respects, constructed for the purposes of war. On the 16th of February, 1818, after being launched, she was purchased by the claimant, Daniels, then a citizen of the United States. A crew of about fifty men were enlisted in Baltimore, and she cleared out for Teneriffe, having in her hold 12 eighteen pound gunnades with their carriages, and a number of small arms, and a quantity of ammunition, entered outwards as cargo. The vessel proceeded directly for Buenos Ayres, where she remained a few weeks, during which time the crew was discharged.

Having obtained a commission from the government at that place to cruize against Spain, a crew was enlisted consisting chiefly of the same persons who had come in the vessel from Baltimore, and she sailed, in June, 1818, on a cruize under the command of the claimant. The next day after she left the port, a commission from General Artigas, as Chief of the Oriental Republic, was produced, under which the claimant declared that he intended to cruize, and that granted by the government of Buenos Ayres was sent back to that place. During this cruize, several Portuguese vessels were captured, and the money, the restitution of which was prayed for by the libellant, was taken out of them. In September, 1818, the Irresistible returned to Baltimore,

and a large sum of money, captured during the cruize, was deposited in the bank.

Decrees were entered in the District and Circuit Courts, restoring the property to the original own-ers, and the cause was brought by appeal to this Court.

Mr. *Winder*, for the appellant and claimant, made the following points :

*Feb. 20th.*

1. That the manner in which the Irresistible left the United States, on her voyage to Buenos Ayres, was not in violation of the statutes of Congress, or the neutral obligations of the United States by the law of nations.

2. It was not contrary to the law of nations for the Oriental Republic, finding the Irresistible in the river La Plata, under the circumstances in which she was, to take her into their service as a cruizer against their enemies.

3. That the conduct of Daniels, and any others who went out in her, in entering into the service of the Oriental Republic, was not contrary to the law of nations, nor in violation of the duties of neutrality im-posed on the United States by the law of nations.

4. But even if the appellant's counsel should be mistaken in this respect, yet there is no evidence in this cause to show that the money attached was taken from the ship Gran Para, nor that any such ship was captured by the Irresistible.

Mr. *D. Hoffman*, contra, after commenting on the testimony to establish the American ownership, and the illegal outfit at Baltimore, of the privateer, argued,

(1.) that the neutrality and laws of this country hav-
ing been violated by the captors, this Court will de-
cree restitution on that ground, though the *commis-
sion* under which they acted were wholly unim-
peachable ; a fact which is not admitted in this case, as
the commissions of Artigas stand upon grounds es-
sentially different from those which justify the com-
missions of Buenos Ayres, the Republic of Colom-
bia, &c.

The law on this subject has become too well set-
tled, and familiar, to justify much reference to, or
comment on, authorities. It was at one time suppo-
sed that neutral nations were, in all cases, obliged by
their amity and neutrality, to rescue the captured
and his property from the power of his enemy, who
had brought them *infra præsidia* of the neutral
country, and to award restitution by a species of *jus
postliminii.* This was certainly, at one time, the
doctrine of the English Courts and jurists, and ob-
tains in some countries on the continent of Europe.[a]

The rule, however, of the Courts of this country,
has been established to be exactly the reverse. As
a general rule, a neutral Court has no such power.
The inquiry as to the validity and efficiency of a bel-
ligerent capture, is referred to the Courts of the cap-
tors ; and the restoring power, exercised on various
occasions by the Courts of this country, springs from

a 2 *Azuni,* 222, 223. 250. 261. *Marten's Priv.* 44. 1 *Molloy,*
58. 60. 66. 76. 87. 100. 6 *Vin. Abr.* 515. 517. 519. 534. 16
*Vin. Abr.* 347. 350. *Beawes, Lex. Mer.* 241. 243, 244. 2 *Brown's
Civ. and Adm. Law,* 214, 215.

certain exceptions, which have been engrafted on the general rule. This Court will inquire into every seizure on the high seas, for the purpose of ascertaining whether the taking were lawful or piratical; for if there be no commission, the seizure is piracy *de facto* and *de jure*, and renders the captors responsible *civiliter et criminaliter*. If there be a commission which at the time of taking was *amortised*, or abused *animo deprædandi*, they would be responsible certainly *civiliter*, perhaps *criminaliter*. If the commission were granted by an incompetent power, every presumption would be in their favour in a criminal proceeding against them ; but they would be civilly responsible before any tribunal administering the *jus gentium*. Every such tribunal, therefore, will inquire, *first*, into the fact of the existence of a commission ; *secondly*, the competency of the power granting it ; both of which are essential in order to distinguish *capture* from *piracy*, and the commission issued by a state or nation from that which is granted by a few associated persons, or an isolated individual, who have assumed the exercise of sovereign power.[a]

With regard to the *exceptions* to the general rule which refers the question of prize or no prize to the Courts of the captors, and repudiates the right in a neutral to restore the *res capta* to those from whom it has been taken, it is said that there are now only two : *first*, where the capture was made within the

a Talbot v. Janson, 3 *Dall*. 133. The Invincible, 1 *Wheat. Rep*. 258. Rose v. Himely, 4 *Cranch*, 241.

neutral territory ;*a* and *secondly*, where the capturing vessel was in the whole, or in any part, owned or equipped, or her force in any degree augmented within the dominions of such neutral state, and this by the general principles of international law, independently of all statutory inhibitions of such ownership, equipment, &c.*b* The uniform series of decisions of the American Courts awards restitution to the original owners, of property thus taken, and the facts of the present case will be found, it is presumed, much stronger than in most others which have occurred.*c*

2. This Court is competent to restore property to the respondent, by the general principles of maritime and international law, without any reference to the proof that the neutrality and laws of this country have been violated by the captors, but on the sole ground that the taking was not *jure belli*, but wholly without commission ; as Artigas does not represent a a state or nation competent to grant a commission to war against Portugal. The principles established by

*a Grotius, de J B. ac. P. l. 3. c. 4. Bynk. Q. J. Pub. l 1. c. 8. Vattel, Droit Des Gens, l. 3 c. 7. § 132. 5 Rob. 15. 373. Bee's Rep. 204.*

*b. Pres. Messages, vol. 1. 21. 24. 27. 36. 42. 47, 48. 56. 61, 62. 72, 73. 78. 82. 87. 95. 9 Cranch, 365. 4 Wheat. Rep. 310, 311.*

*c Bee's Rep. 9. 11. 23. 60. 73. 114. 292. 299.*, 3 *Dall.* 285. 307. 319. 2 *Peters*, 345. The Alerta, 9 *Cranch.* 359 Divina Pastora, 4 *Wheat. Rep.* 53. The Estrella, 4 *Wheat. Rep.* 298. The Nuestra Senora, *Ib.* 695. Amistad de Rues, 5 *Wheat. Rep.* 385. The Bello Corrunes, 6 *Wheat. Rep.* 152. Nueva Anna, *Ib.* 193. Conception, *Ib.* 335.

the cases recently decided by this Court, do not impugn the doctrine contended for, as they occurred in the case of commissions granted by such of the South American provinces, as our government, in the opinion of the Court, had recognised to be in a civil war with *Spain*, the mother country, and which commissions only operated against such *parent* state. Our government and this Court having, in no instance whatever, recognised *Artigas* as engaged in a war, even with *Spain*, the mother country, and certainly not with *Portugal*, he is wholly incompetent to issue commissions of prize, as much so as any *other individual* in the Spanish provinces. This Court, therefore, is competent as an *Instance* Court to decree restitution and damages, as in ordinary cases of maritime tort, and to decide (negatively) that the Banda Oriental is not a state or nation invested with the attributes of sovereignty, the former or ancient state of things being presumed to remain *de facto*, as well as *de jure*.

The government of the United States has, in no instance, recognized Artigas as engaged in a civil war with Spain, or in a war of any kind with Portugal. If we refer to the documents recognizing the South American provinces, as engaged in a civil war with Spain, we shall find no mention made of such a war by Artigas, or the Banda Oriental.[a] The general expression, "South American Provinces," is

a 9 *Niles' Regist.* 393. 396. *Let. Sec. State*, 19th *Jan.* 1816. *Mess.* 17th *Nov.* 1818. 4 *Wheat. Rep. Appx.* 23. *Mess.* 17th *Dec* 1819. *Mess.* 8th *March*, 1822.

1822.

The
Gran Para.

qualified by the express mention of Buenos Ayres and Venezuela. But if the Banda Oriental, as modified by Artigas, might be embraced under such a general recognition of the South American provinces being engaged in a civil war with Spain, still it would be incumbent on the claimant to prove that this country ever was a *province* of Spain : it may have been a *part* of a province : we have no historical or geographical account of the country that is by any means satisfactory ; and if Artigas, and his wretched and savage followers be recognized as qualified to wage *war*, then may every township, district, city, village, hamlet, or individual, claim the same high prerogative. If Artigas, and a few adherents, can segregate themselves from the common cause, and constitute themselves a state or nation competent to wage either a civil or public war, may not every individual in the Spanish provinces claim the same right ? Where is the boundary, or clear line of demarcation ? By what principle can such a right be regulated, except by requiring that the power claiming the right should be possessed of the elements or constituents of a nation, such as a *fixed domain*, a *national treasury*, a *national force*, a *code* of *laws*,[a] and perhaps, in order to wage a maritime war, sea ports ? Nor will Grotius, nor his enlightened commentator, allow a company or horde of men to be a state or nation, although they may observe some kind of government and equity among themselves.

a *Sir L. Jenk.* 424. 791. *Bynk. Q. J. Pub. l.* 1. *c.* 17. *Grot. l.* 1. *c.* 3. § 34. *l.* 3 *c.* 3. § 1, 2. *Cic. Phill.* 4. *cap.* 4.

All that we know of Artigas and his adherents, pro-claims *him* a mere adventurer, and *them* a law-less band to whom he is the sole tie of union. Artigas is mentioned by these documents to be en-gaged in a contest with Buenos Ayres; but it is no where stated that he is the chief magistrate of a pro-vince engaged in a civil war with Spain. The only executive notice of the Banda Oriental, is in the Pre-sident's message of the 17th November, 1818. On submitting to Congress the documents furnished him by our commissioners, he states, that " it appears from these communications, that the government of Buenos Ayres declared itself independent, in July, 1816; that the *Banda Oriental*, Entre Rios, and Paraguay, with the city of Santa Fée, all of which *are also independent*, are," &c.

This, surely is not a recognition of their indepen-dence; for the Executive, I presume, has no power to make such recognition; nor is it a recognition of the existence of a civil war between tne Banda Ori-ental and Spain. It will also be observed, that in the late message of the President, 8th March, 1822, no mention whatever is made of the Banda Ori-ental.

But if it be admitted, *argumenti gratia*, that the Banda Oriental was a South American province, engaged in a civil war with Spain, the mother coun-try, would such a *partial* recognition clothe its chieftain with the power of waging war, against a nation in no way connected with Spain? The sound doctrine, perhaps, is, that a *colony*, though competent to disenthral itself from the despotism of an unnatu-

ral parent, and therefore, to wage a civil war, does not thereby become a nation or state, invested with all the high privileges of sovereignty. What would be the consequences of a contrary doctrine? Every minute division of an empire might *per saltum* become a nation, claiming, and asserting, all the prerogatives of free and independent states. These new-fledged, self-constituted, unorganized hordes of people, perhaps only half civilized, might then well assert their claim to sit in the councils of the great family of nations. They would claim the rights of embassy, of establishing consulates, and of inflicting all the rigours of public wars, as blockades, visitation and search, impressments, seizure, and confiscation of contraband. Such an individual as Artigas, whom no one knows, might, under this doctrine, claim to exercise every belligerent right, and, in waging his triple war, might capture, under the right of blockade, the vessels of every nation presuming to enter Buenos Ayres, Maldonado, Lisbon, or the mouth of the Tagus, though he possessed not a single seaport, or a single vessel of his own. It is, therefore, presumed that every colony recognized as engaged in a civil war for the assertion of its independence, must rigidly restrict itself to the contest with the parent country and its allies; and cannot wage a distinct, and independent war with other nations. If, therefore, the Banda Oriental be regarded as on the same footing with Buenos Ayres, or Venezuela, it cannot war against Portugal : for no alliance is pretended between Spain and Portugal, and if it were

asserted, it must be proved.[a] The contest between Artigas and Portugal originated in a *special* cause, and was prosecuted for a special purpose, viz. the recovery of Monte Video, which had been taken possession of by the Portuguese, because Spanish supremacy having ceased to operate there, the Spaniards had carried on a series of the most vexatious depredations on the adjoining Portuguese provinces, which it became the imperious duty of Portugal to check and terminate. Spain, on the other hand, was engaged in a war with some of its provinces, for general, and very different objects: the conflict, therefore, between Portugal and Artigas, could not by implication, make the former an ally of Spain. If the government recognition be a limited and partial one, (as it certainly is,) so should the *effects* of such recognition be partial. The fact recognized by this government, is, that a *civil* war rages between Spain and her South American provinces. In regard to Buenos Ayres, and Venezuela, this was certainly the fact; but government d d not mean, thereby, to acknowledge the *independence* of these provinces. The effect of this recognition is defined by the Court, in *Palmer's* case, and that of the *Divina Pastora,* to be, that the Courts of this country will not regard as *criminal,* those acts of hostility which the province may direct against its enemy; nor will they undertake to judge of the validity of captures made under their commission, unless the maintenance of our laws and neutrality should require it.

1822.

The
Gran Para.

a 1 *Ves.* 283. 292.

The acknowledged competency, therefore, of these provinces, to wage a *civil* war, does not clothe them with any powers beyond the sphere of the necessary operation of this right: they have no right to war with other nations, nor to claim the attributes and powers of sovereign states. If this be sound in regard to the known provinces, it must be emphatically so in relation to the Banda Oriental, and its chieftain; who claims not only to war with Spain and her provinces, but with Portugal likewise, which is no way connected with either.

Again; there having been no *express* recognition of the existence of a civil war between Jose Artigas and Spain; can this Court *imply* such recognition from any circumstances? It would seem not. The power to regard a people emerging from barbarism to civilization and government; or from a colonial, to an independent state, is a prerogative exclusively of the government.[a] Courts are bound to regard the ancient state of things as remaining, until there be a recognition by the proper authority, and, therefore, though it be competent for Courts to declare that a people *do not constitute* a state, they cannot affirmatively declare, that they *are* a state. Nor is it competent for this Court to recognize the existence of a *civil* war: this, also, is a government power, and if there be no such express recognition of the fact of a civil war between the Banda Oriental and Spain, this Court will not infer it from the use of a general

*a* 9 *Ves.* 347. 10 *Ves.* 353. Rose v. Himely, 4 *Cranch*, 272. Gelston v. Hoyt, 3 *Wheat. Rep.* 289. 295. 324.

expression, such as, " South American provinces."
The doctrine laid down by this Court in Palmer's
case,[a] (in which a distinction was taken between an
unqualified recognition of the independence of a
people, and a partial recognition resulting from the
admission of the existence of a civil war between a
colony and the parent state,) is in no degree at va-
riance with the principle established in the previous
cases of *Rose* v. *Himely*, and *Gelston* v. *Hoyt*, " that
Courts do not possess the power of first recognizing
the national character of a people." Whether the
recognition be unqualified or partial, the government
must speak *distinctly*; otherwise, the Courts will
regard the ancient state of things; and all acts done
on the high seas, under the authority of such *separa-
ted* people, will be looked on as wholly unauthorized
and null.

3. The claimant, Daniels, is a citizen of the Uni-
ted States, and appears before this Court as a claim-
ant for property procured through means forbidden
by the laws of the country, and the duties and obli-
gations of a good citizen. He is an *unworthy* claim-
ant, and as such will not be permitted to claim the
result of his own wrongs, and illegal acts. " A
claim," says Sir William Scott, " founded on piracy,
or any other act, which in the general estimation of
mankind is held to be illegal or immoral, might, I
presume, be rejected in any Court on *that ground
alone* ;"[b] and Mr. Justice JOHNSON, in the case of

---

*a* 3 *Wheat. Rep.* 610.     *b* The Diana, 1 *Dodson*, 95. 10°.

the Bello Corrunes, expresses himself emphatically to the same effect.[a]

4. With respect to there being no proof as to the seizure of the *Gran Para*, from which the money libelled is alleged to have been taken, it is presumed that this is altogether immaterial. The libel states the fact of the seizure of the *Gran Para*, and other Portuguese vessels ; the answer expressly admits the taking of the money in controversy, and other money, from *Portuguese* vessels, and the inquiry is, whether it be the Portuguese property, and if so, whether it were rightfully taken.

Mr. *Winder*, in reply, insisted that the Court would confine its interference to such cases of illegal capture, as would make the United States responsible to the injured foreign country, by the law of nations, or to such acts as are in violation of our statutes of neutrality ; restraining their operation to such provisions as are required and justified by the public law. He compared this case to the analogous one of carrying contraband. The neutral nation was not responsible. The building of ships for sale was a lawful branch of commerce, and even if they were armed and equipped for war, they could only be considered as contraband ; and though they might be subject to the penalty of confiscation, if taken in their transit to a belligerent, yet, if once incorporated into the mass of his military marine, they could be considered by neutrals in no other light than the rest of his naval force. But even supposing the ori-

*a* 6 *Wheat. Rep.* 172.

ginal outfit in the ports of the United States to have been illegal, the vessel was not commissioned as a privateer, nor did she attempt to act as one, until her arrival in the river La Plata, when a lawful commission was obtained, and the crew re-enlisted. Even if she had made captures on her outward voyage, the *delictum* would be purged by the termination of that voyage, according to the analogies of the maritime law in other cases. This Court has never yet determined that the original offence is indelible, and that it adheres to the vessel, whatever changes may have taken place, and that it cannot be deposited at the termination of the cruize, in preparing for which, the offence was committed; and as the Irresistible made no captures on her passage from Baltimore to the River La Plata, and even if she had, the offence was deposited at the latter port, the Court cannot connect her subsequent cruize with the transactions at Baltimore, or those which might have happened on her outward voyage. The learned counsel also argued, that the Banda Oriehtal was a sovereign state *de facto*, which had been acknowledged by the executive government of this country, as one of the parties to the war between Spain and her Colonies, and which was engaged in an incidental contest with Portugal, which gave it the rights of war in respect to that power. He also insisted on such of the points in his argument on a former day, in the case of the *Santissima Trinidad,* as were applicable to the present. But as they will be found re-

1822.

The
Gran Para.
March 13th.

ported at large in that case,[a] it is not deemed necessary to repeat them in this place.

Mr. Chief Justice MARSHALL delivered the opinion of the Court, and after stating the facts, proceeded as follows:

The principle is now firmly settled, that prizes, made by vessels which have violated the acts of Congress, that have been enacted for the preservation of the neutrality of the United States, if brought within their territory, shall be restored. The only question therefore is, does this case come within the principle.

That the Irresistible was purchased, and that she sailed out of the port of Baltimore, armed and manned as a vessel of war, for the purpose of being employed as a cruizer against a nation with whom the United States were at peace, is too clear for controversy. That the arms and ammunition were cleared out as cargo cannot vary the case. Nor is it thought to be material that the men were enlisted in form as for a common mercantile voyage. There is nothing resembling a commercial adventure in any part of the transaction. The vessel was constructed for war, and not for commerce. There was no cargo on board but what was adapted to the purposes of war. The crew was too numerous for a merchantman, and was sufficient for a privateer. These circumstances demonstrate the intent with which the Irresistible sailed out of the port of Baltimore.

a Ante, pp. 290—296.

But she was not commissioned as a privateer, nor did she attempt to act as one, until she reached the river La Plata, when a commission was obtained, and the crew re-enlisted. This Court has never decided, that the offence adheres to the vessel whatever changes may have taken place, and cannot be deposited at the termination of the cruize in preparing for which it was committed; and as the Irresistible made no prize on her passage from Baltimore to the River La Plata, it is contended that her offence was deposited there, and that the Court cannot connect her subsequent cruize with the transactions of Baltimore.

If this were to be admitted in such a case as this, the laws for the preservation of our neutrality would be completely eluded, so far as this enforcement depends on the restitution of prizes made in violation of them. Vessels completely fitted in our ports for military operations, need only sail to a belligerent port, and there, after obtaining a commission, go through the ceremony of discharging and re-enlisting their crew, to become perfectly legitimate cruizers, purified from every taint contracted at the place where all their real force and capacity for annoyance was acquired. This would, indeed, be a fraudulent neutrality, disgraceful to our own government, and of which no nation would be the dupe. It is impossible for a moment to disguise the facts, that the arms and ammunition taken on board the Irresistible at Baltimore, were taken for the purpose of being used on a cruize, and that the men there enlisted, though engaged, in form, as for a

commercial voyage, were not so engaged in fact. There was no commercial voyage, and no individual of the crew could believe that there was one. Although there might be no express stipulation to serve on board the Irresistible, after her reaching the La Plata, and obtaining a commission, it must be completely understood that such was to be the fact. For what other purpose could they have undertaken this voyage. Every thing they saw, every thing that was done, spoke a language too plain to be misunderstood.

The act of June, 1794, c. 296. declares, that "if any person shall, within the territory or jurisdiction of the United States," " hire or retain another person to go beyond the limits or jurisdiction of the United States, with intent to be enlisted or entered in the service of any foreign prince or state as a soldier, or as a mariner, or seaman, on board of any vessel of war, letter of marque, or privateer, every person so offending, shall be guilty of a high misdemeanor," &c.

Now if the crew of the Irresistible were not enlisted in the port of Baltimore, to cruize under the commission afterwards obtained, it cannot, we think, be doubted, but that they were "hired or retained to go beyond the limits or jurisdiction of the United States, with intent to be enlisted or entered" into that service. For what other purpose were they hired in the port of Baltimore for the voyage to La Plata ?

The third section makes it penal for any person, within any of the waters of the United States, to be

" knowingly concerned in the furnishing, fitting out, or arming of any ship or vessel, with intent that such ship or vessel shall be employed in the service of any foreign prince or state, to cruize," &c.

It is too clear for controversy, that the Irresistible comes within this section of the law also.

The act of 1817, c. 58. adapts the previous laws to the actual situation of the world, by adding to the words, " of any foreign prince or state," the words, " or of any colony, district, or people," &c. The act of April, 1818, c. 83. re-enacts the acts of 1794, 1797, and 1817, with some additional provisions.

It is, therefore, very clear, that the Irresistible was armed and manned in Baltimore, in violation of the laws and of the neutral obligations of the United States. We do not think that any circumstances took place in the river La Plata, by force of which this taint was removed. To the objection that there is no proof that any part of the money was taken out of a vessel called the " Gran Para," it need only be answered, that the allegation of the libel is, that she was called the " Gran Para, or by some other name."

Decree affirmed with costs.