## LEMKE, AS ATTORNEY GENERAL OF THE STATE OF NORTH DAKOTA, ET AL. *v.* FARMERS GRAIN COMPANY OF EMBDEN, NORTH DAKOTA.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 456. Argued November 14, 1921.—Decided February 27, 1922.

1. In a suit in the District Court which arises under a law of the United States as well as under the Constitution, in that the bill attacks a state statute both as violative of the Constitution directly and as in conflict with an act of Congress, the judgment may be reviewed by the Circuit Court of Appeals. P. 52.
2. In the general and usual course of its trade, a North Dakota association bought grain in that State, placed it in its elevator, loaded it promptly on cars and shipped to other States for sale. The grain, even after loading, was subject to be diverted and sold locally if the price was offered, but local sales were unusual, the company's entire market, practically, being outside North Dakota. *Held:* (a) That the business, including the buying of the grain in North Dakota, was interstate commerce. P. 54. *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282. (b) As applied to this business, a North Dakota statute, c. 138, Laws 1919, requiring purchasers of grain to obtain a license and pay a license fee, and to act under a defined system of grading, inspection and weighing, and subjecting the prices paid and profits made to regulation, was a direct burden on interstate commerce. P. 55.
3. Even when the particular subject remains unregulated by Congress, a State cannot lay burdens on interstate commerce in the guise of police regulations to protect the welfare of her people. P. 58. *Merchants Exchange* v. *Missouri,* 248 U. S. 365, distinguished.

4. A state statute unconstitutional in a part essential and vital to its whole scheme, can not be enforced by this court in its other provisions.  P. 60.

273 Fed. 635, affirmed.

APPEAL from a decree of the Circuit Court of Appeals, reversing a decree of the District Court and directing a permanent injunction in a suit against officials of North Dakota, brought to restrain them from enforcing, against the appellee, the North Dakota Grain Grading and Inspection Act.  See also the next case, *post,* 65.

*Mr. Seth W. Richardson,* with whom *Mr. William Lemke,* Attorney General of the State of North Dakota, *Mr. Karl Knox Gartner* and *Mr. George K. Foster* were on the briefs, for appellants.

*Mr. David F. Simpson,* with whom *Mr. W. A. McIntyre, Mr. O. B. Burtness, Mr. Sveinbjorn Johnson, Mr. William A. Lancaster, Mr. John Junell, Mr. James E. Dorsey* and *Mr. Harold G. Simpson* were on the brief, for appellee.

MR. JUSTICE DAY delivered the opinion of the court.

This suit was brought by the complainant, a coöperative association incorporated under the laws of North Dakota, and engaged in the business of operating a public elevator and warehouse for the purchase, sale, distribution and storage of wheat, oats, rye, barley, seeds and flax at the village of Embden in that State. The association retains no profit. If there is a surplus over operating expenses at the close of the season, such surplus is distributed among the grain growers according to the amount sold by each. The purpose of the suit is to enjoin the enforcement of the North Dakota Grain Grading and Inspection Act, passed February 11, 1919, c. 138, North Dakota Laws, 1919. The bill, omitting allegations

as to certain federal statutes which have become obsolete, is based upon two grounds: 1st. That the state statute is an unlawful regulation of and burden upon interstate commerce and, therefore, violates the Commerce Clause of the Federal Constitution. 2nd. That the state statute is in conflict with the Federal Grain Standards Act of August 11, 1916, c. 313, 39 Stat. 482, 485.

Upon filing its bill, complainant moved for a temporary injunction, which application was heard before three federal judges. A motion to dismiss the suit was also filed. The court denied this motion and granted a temporary injunction, finding that the North Dakota law imposed a substantial burden upon interstate commerce, and was in conflict with the Federal Grain Standards Act. Afterwards an answer was filed by the Attorney. General of North Dakota on behalf of all the defendants, and later a separate answer was filed on behalf of Ladd and McGovern, officials charged with the execution of the state laws. Upon trial the District Court denied the injunction, and held that the state statute did not place a burden upon interstate commerce, and was not in conflict with the Federal Grain Standards Act, and entered a decree accordingly, from which appeal was taken to the Circuit Court of Appeals for the Eighth Circuit. That court reversed the decree of the District Court, held the state statute unconstitutional, and invalid as in conflict with the federal statute, and directed the issuance of a permanent injunction to prevent the enforcement of the state law. 273 Fed. 635.

At the threshold we are met with a question of the jurisdiction of the Circuit Court of Appeals to review the decree of the District Court. It is well settled that when the jurisdiction of the District Court rests solely upon an attack upon a state statute because of its alleged violation of the Federal Constitution, a direct appeal to this court is the only method of review. § 238, Judicial Code.

*Carolina Glass Co.* v. *South Carolina*, 240 U. S. 305, and cases cited. It is equally well settled that where the jurisdiction is invoked upon other federal grounds, as well as the one attacking the constitutionality of a statute of a State, an appeal may be taken to the Circuit Court of Appeals, with ultimate review in this court if the cause is within a class within our jurisdiction. In our view the case falls within the class permitting appeal to the Circuit Court of Appeals. Section 24, Judicial Code, gives to the District Court jurisdiction of cases arising under the Constitution or laws of the United States. The attack upon the state statute because of its repugnancy to the federal statute required a consideration and construction of both statutes, and their application to the facts found. These considerations presented a ground of jurisdiction arising under a law of the United States, and was not dependent solely upon the application and construction of the Federal Constitution. *Spreckels Sugar Refining Co.* v. *McClain*, 192 U. S. 397, 407; *City of Pomona* v. *Sunset Telephone Co.*, 224 U. S. 330. We, therefore, hold that the Circuit Court of Appeals had jurisdiction of the cause.

We pass to a consideration of the merits. The record discloses that North Dakota is a great grain-growing State, producing annually large crops, particularly wheat, for transportation beyond its borders. Complainant, and other buyers of like character, are owners of elevators and purchasers of grain bought in North Dakota to be shipped to and sold at terminal markets in other States, the principal markets being at Minneapolis and Duluth. There is practically no market in North Dakota for the grain purchased by complainant. The Minneapolis prices are received at the elevator of the complainant from Minneapolis four times daily, and are posted for the information of those interested. To these figures the buyer adds the freight and his "spread," or margin, of profit. The

purchases are generally made with the intention of shipping the grain to Minneapolis. The grain is placed in the elevator for shipment and loaded at once upon cars for shipment to Minneapolis and elsewhere outside the State of North Dakota. The producers know the basis upon which the grain is bought, but whoever pays the highest price gets the grain, Minneapolis, Duluth or elsewhere. This method of purchasing, shipment and sale is the general and usual course of business in the grain trade at the elevator of complainant and others similarly situated. The market for grain bought at Embden is outside the State of North Dakota, and it is an unusual thing to get an offer from a point within the State. After the grain is loaded upon the cars it is generally consigned to a commission merchant at Minneapolis. At the terminal market the grain is inspected and graded by inspectors licensed under federal law.

That such course of dealing constitutes interstate commerce, there can be no question. This court has so held in many cases, and we have had occasion to discuss and decide the nature of such commerce in a case closely analogous in its facts, and altogether so in principle. *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282. In that case the facts disclose that a company organized in Tennessee and carrying on business there, went into Kentucky and, through an agent there, bought wheat for shipment to the company's mill in Tennessee. The state court held that the transaction was merely a purchase of wheat in Kentucky, and made the Tennessee company amenable to the regulatory statutes of the State. This court rejected the conclusion of the state court, and held that the buying, no less than the selling, of grain under such circumstances was a part of interstate commerce, committed to national control by the Federal Constitution. Applying the principle of that decision, and the previous decisions

of this court cited in the opinion, the complainant's course of dealing in the buying of grain, which it purchased and sold under the circumstances as herein disclosed, was interstate commerce. Being such, the State could not regulate the business by a statute which had the effect to control and burden interstate commerce.

Nor is this conclusion opposed by cases decided in this court and relied upon by appellants, in which we have had occasion to define the line between state and federal authority under facts presented which required a definition of interstate commerce where the right of state taxation was involved, or manufacture or commerce of an intrastate character was the subject of consideration. In those cases we have defined the beginning of interstate commerce as that time when goods begin their interstate journey by delivery to a carrier or otherwise, thus passing beyond state authority into the domain of federal control. Cases of that type are not in conflict with principles recognized as controlling here. None of them indicates, much less decides, that interstate commerce does not include the buying and selling of products for shipment beyond state lines. It is true, as appellants contend, that after the wheat was delivered at complainant's elevator, or loaded on the cars for shipment, it might have been diverted to a local market or sent to a local mill. But such was not the course of business. The testimony shows that practically all the wheat purchased by the complainant was for shipment to and sale in the Minneapolis market. That was the course of business, and fixed and determined the interstate character of the transactions. *Swift & Co.* v. *United States,* 196 U. S. 375; *Eureka Pipe Line Co.* v. *Hallanan,* 257 U. S. 265; and *United Fuel Gas Co.* v. *Hallanan,* 257 U. S. 277.

In view of this state of facts we come to inquire whether the North Dakota statute is a regulation of interstate

commerce, and, therefore, beyond the legislative power of the State. Pertinent parts of the act are stated in the margin.[1]

This act shows a comprehensive scheme to regulate the buying of grain. Such purchases can only be made by those who hold licenses from the State, pay state charges for the same, and act under a system of grading, inspect-

---

[1]Authority is given to a State Inspector appointed by the Governor,—

(a) To appoint a Chief Deputy State Inspector of Grades, Weights and Measures; a Chief Elevator Accountant; Deputy Inspector of Grades, Weights and Measures; State Deputy Inspector of Grades, Weights and Measures, and Warehouse Inspectors;

(b) To issue licenses to warehouses, buyers and solicitors of grain, seeds and other agricultural products;

(c) To establish uniform grades for grain, etc., for the State of North Dakota; to alter and modify such grades;

(d) To establish uniform grade certificates used in marketing the grain, etc.;

(e) To hear and determine appeals from State Deputy Inspectors and from Deputy Inspectors of Grades, Weights and Measures;

(f) To conduct investigations in regard to marketing, grading and weighing of grain, etc.;

(i) To establish a reasonable margin to be paid producers of grain by warehouses, elevators and mills;

(j) To fix and determine all charges for grading, inspecting and weighing grain, etc.;

(k) To make rules, etc., to carry out the provisions of the act.

Sec. 3. It is made the duty of the Inspector of Grades, Weights and Measures to define and establish uniform grades and weights for grain, etc. In establishing such grades, dockage shall be considered as being of two classes: (1st) that having value, (2nd) that having no value, the former to be paid for at its market value.

Sec. 4. The term "Deputy Inspector of Grades, Weights and Measures" under this act means any firm, person, company, corporation or association that buys, weighs and grades grain, etc., and holds a license issued therefor by the State Inspector of Grades, Weights and Measures.

Sec. 5. The term "State Deputy Inspector of Grades, Weights and Measures" within the meaning of this act is defined as one who is

ing and weighing fully defined in the act. Furthermore, the grain can only be purchased subject to the power of the state grain inspector to determine the margin of profit which the buyer shall realize upon his purchase. This authority is conferred in § 23, and the margin of profit is defined to be the difference between the price paid at the North Dakota elevator and the market price,

---

in the employment of the State of North Dakota and has received an appointment from the State Inspector of Grades, Weights and Measures.

Sec. 10. Deputy Inspectors shall weigh, inspect and grade grain that shall be offered for sale or shipment at their market place, according to the provisions of this act and the rules and regulations established by the State Inspector. They shall issue a certificate stating the kind of grain, etc., giving the grade, test-weight per bushel and the reason for all grades below number 1, and shall deliver to the owner or agent of such grade said certificate; it is also made their duty to accurately sample grain, etc., in wagon loads, carloads or other containers and forward samples thereof to the State Inspector of Grades, Weights and Measures when instructed by him to do so.

Sec. 11. The State Inspector may issue a license to any person engaged in buying, weighing and inspecting or grading grain, etc., or to the buyer or agent of a privately or publicly owned warehouse, elevator or flour mill, provided they pass an examination as to their competency as may be prescribed by the State Inspector; the license requires such Deputy Inspectors to fix grades and dockage of grain, etc., inspected at their respective places of business—and to weigh same according to this act and the regulations promulgated thereunder. The State Inspector may issue licenses to persons soliciting or procuring assignments of grain, etc., after they have passed an examination as to their competency; the State Inspector may suspend or revoke licenses when he determines licensee is incompetent, or has knowingly or carelessly graded grain improperly, or has issued any false certificate of grading, or violated the act or rules made thereunder, etc.

Sec. 14. Makes it unlawful for any person to buy or grade grain, etc., without a license as a Deputy Inspector of Grades, Weights and Measures; or for any person, corporation or association operating a public warehouse to purchase, weigh, grade or inspect grain, etc., without first obtaining a Deputy Inspector's license, provided that

with an allowance for freight, at the Minnesota points to which the grain is shipped and sold. That is, the state officer may fix and determine the price to be paid for grain which is bought, shipped, and sold in interstate commerce. That this is a regulation of interstate commerce, is obvious from its mere statement.

Nor will it do to say that the state law acts before the interstate transaction begins. It seizes upon the grain and controls its purchase at the beginning of interstate commerce. *Pennsylvania R. R. Co.* v. *Clark Brothers Coal Mining Co.*, 238 U. S. 456, 468.

It is contended that these regulations may stand upon the principles recognized in decisions of this court which permit the State to make local laws under its police power in the interest of the welfare of its people, which are valid

---

this section shall not prohibit State Deputy Inspectors from inspecting, weighing and grading grain, etc., under the direction and supervision of the State Inspector; and shall not prohibit producers from buying and selling grain, etc., to one another.

Sec. 16. The State Inspector after cancellation or suspension of license may permit the business of the licensee to be completed and closed out under the inspection and supervision of a State Deputy Inspector who shall be stationed at the place of business of such licensee; all expenses to be paid by the licensee;

Sec. 18. The State Inspector may establish central markets for the display of samples of grain, etc., at cities or towns within or without the State of North Dakota. Such markets shall be open to any and all persons desiring to buy or sell on said market and shall be operated and conducted under such rules and regulations as the State Inspector may establish.

Sec. 20. Makes it the duty of all Deputy Inspectors to keep a record showing: names and addresses of patrons of their respective warehouses, elevators, or mills; prices paid for agricultural products; the grades given; prices received and the grades received at terminal markets or within the State.

Sec. 23. The State Inspector is authorized, upon complaint of a producer of grain, etc., that any warehouse, elevator or mill is paying an unreasonable margin, to investigate, determine and establish a reasonable margin to be paid such producer for grain, etc.

although affecting interstate commerce, and may stand, at least until Congress takes possession of the field under its superior authority to regulate commerce among the States. This principle has no application where the State passes beyond the exercise of its legitimate authority and undertakes to regulate interstate commerce by imposing burdens upon it. This court stated the principle and its limitations in the discussion of the subject in the *Minnesota Rate Cases,* 230 U. S. 352. In the course of the opinion in that case, we said (p. 400):

"The principle, which determines this classification [between federal and state power], underlies the doctrine that the States cannot under any guise impose direct burdens upon interstate commerce. For this is but to hold that the States are not permitted directly to regulate or restrain that which from its nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains.

"Thus, the States cannot tax interstate commerce, either by laying the tax upon the business which constitutes such commerce or the privilege of engaging in it, or' upon the receipts, as such, derived from it (*State Freight Tax Case,* 15 Wall. 232; *Robbins* v. *Shelby Taxing District,* 120 U. S. 489; *Philadelphia & Southern Mail S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Leloup* v. *Mobile,* 127 U. S. 640; *McCall* v. *California,* 136 U. S. 104; *Brennan* v. *Titusville,* 153 U. S. 289; *Galveston, Harrisburg & San Antonio Railway Co.* v. *Texas,* 210 U. S. 217; *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1; *Pullman Co.* v. *Kansas,* 216 U. S. 56; *Meyer* v. *Wells, Fargo & Co.,* 223 U. S. 298; *Crenshaw* v. *Arkansas,* 227 U. S. 389). . . ."

Applying the principle here, the statute denies the privilege of engaging in interstate commerce except to dealers licensed by state authority, and provides a system which enables state officials to fix the profit which may be made in dealing with a subject of interstate commerce.

It is insisted that the price fixing feature of the statute may be ignored, and its other regulatory features of inspection and grading sustained if not contrary to valid federal regulations of the same subject. But the features of this act, clearly regulatory of interstate commerce, are essential and vital parts of the general plan of the statute to control the purchase of grain and to determine the profit at which it may be sold. It is apparent that without these sections the state legislature would not have passed the act. Without their enforcement the plan and scope of the act fails of accomplishing its manifest purpose. We have no authority to eliminate an essential feature of the law for the purpose of saving the constitutionality of parts of it. *International Textbook Co.* v. *Pigg*, 217 U. S. 91, 113, and cases cited.

Nor is the appellants' contention upheld by the decision of this court in *Merchants Exchange* v. *Missouri*, 248 U. S. 365. In that case this court sustained the constitutionality of a statute of Missouri providing that in cities having more than seventy-five thousand inhabitants buildings used for the storage of grain shall be deemed public warehouses; and prohibiting the issue of weight certificates by other than authorized bonded state weighers. We held that the state statute did not violate the due process clause or the interstate commerce clause of the Federal Constitution. Furthermore, it was held that the act, under the facts of that case, did not violate the United States Grain Standards Act, as the latter did not regulate weighing; and, for reasons stated, did not violate the United States Warehouse Act. The act, there in question, did not undertake to regulate the buying of grain in interstate commerce, nor to levy a license tax upon the privilege, nor to fix the profit which could be realized on grain bought, shipped, and sold in interstate commerce.

It is alleged that such legislation is in the interest of the grain growers and essential to protect them from

fraudulent purchases, and to secure payment to them of fair prices for the grain actually sold.   This may be true, but Congress is amply authorized to pass measures to protect interstate commerce if legislation of that character is needed.   The supposed inconveniences and wrongs are not to be redressed by sustaining the constitutionality of laws which clearly encroach upon the field of interstate commerce placed by the Constitution under federal control.

We agree with the Circuit Court of Appeals that this legislation is beyond the power of the State, as it is a regulation of interstate commerce when applied to complainant's business.   This conclusion renders it unnecessary to consider whether the provisions of the state act are in contravention of the regulations provided in the Federal Grain Standards Act as was held by the Circuit Court of Appeals.

The decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE BRANDEIS dissenting, with whom MR. JUSTICE HOLMES and MR. JUSTICE CLARKE concur.

The United States Grain Standards Act of August 11, 1916, c. 313, Part B, 39 Stat. 482, 483, authorizes the Secretary of Agriculture to establish standards (or grades) of quality and condition for different kinds of grain and provides that, when such standards shall have been established, shipment of any such grain for sale by grade in interstate commerce is prohibited, unless the grain has either been inspected before shipment or is to be inspected en route or at destination, by an inspector licensed under the federal act.   Shipment without such inspection is permitted whenever the sale is by sample or by some description other than the official grade.   The act does not purport to deal in any way with sales in intrastate commerce.

In 1919 the Legislature of North Dakota concluded that its farmers were being systematically defrauded in purchases of their grain made within the State. The buyers were largely local mills, of which there are 160, and local elevators, of which there are 2,200. The fraud was perpetrated, in part, by underweighing and undergrading in the unofficial inspection of the grain made locally by or on behalf of the purchasers. In part, the fraud was perpetrated by means of unconscionable bargains made locally, through which valuable dockage was obtained from the farmer without any payment therefor or by which the grain itself was bought at less than its fair value. Against such frauds the federal act did not purport to afford any protection. So far as the transactions were wholly intrastate, Congress was without power to do so. So far as the sales were part of transactions in interstate commerce, the power was ample; but Congress did not see fit to exert it. And the Secretary of Agriculture did not even exercise his authority to provide for federal inspection and grading within North Dakota of such grain as was shipped from there in interstate commerce. That was left by him to be done after the grain reached Minnesota or other States.

To protect the North Dakota farmer against these frauds practiced by local buyers its Legislature enacted c. 138 of the Laws of 1919. The statute seeks to effect protection (a) by establishing a system of state inspection, grading and weighing; (b) by prohibiting anyone from purchasing grain before it is inspected, graded and weighed (except that one producer may buy from another); (c) by ascertaining in the course of inspection, grading and weighing, the amount of dockage, and requiring a purchaser of the grain either to pay separately for the dockage or to return the same to the farmer; (d) by requiring payment to the farmer of the fair value of grain—the value to be

ascertained by fixing the so-called margin; (e) by ensuring compliance with the above provisions through the further provision that only persons or concerns licensed to inspect, grade and weigh may buy grain before it has been officially inspected. The standards of quality and condition established by the Secretary of Agriculture were adopted under regulations issued by the State Inspector of Grades, Weights and Measures; and all state inspectors (including licensed buyers) were required to observe those grades.

Ordinarily when a State's police power is exerted in connection with sales it is the buyer whom the law seeks to protect; and the seller is licensed as part of the machinery to enforce the regulations prescribed. I cannot doubt that the State has power as broad to protect the seller and, to that end, to license the buyer. Compare *House* v. *Mayes,* 219 U. S. 270. Ordinarily the function of inspection, grading and measurement is committed to a public official or other impartial person. But I am not aware of any constitutional objection to imposing the duty upon the buyer, where conditions demand it. The requirement that the amount of the dockage shall be ascertained and that it shall be paid for separately or be returned, does not differ in principle from the requirement upheld in *McLean* v. *Arkansas,* 211 U. S. 539, that coal shall be measured before screening, or the requirement upheld in *Knoxville Iron Co.* v. *Harbison,* 183 U. S. 13, that store orders shall be redeemed in cash, or that upheld in *House* v. *Mayes, supra,* which prohibited, in the purchase of grain; making arbitrary deductions from the actual weight. The requirement that the buyer shall take only a proper margin for graded grain is, in effect, requiring that he pay a fair price. Laws designed to prevent unfair prices are ordinarily enacted to protect consumers. But there is no constitutional objection to protecting producers against unconscionable bargains, if con-

ditions are such that it is they who require protection.. Nor can there be any constitutional objection to using, as a factor in determining what is fair, the price prevailing in terminal markets—even if they happen to be located in another State.

Whether the purchases involved in this case were intrastate or interstate commerce we need not decide. For the fact that a sale or purchase is part of a transaction in interstate commerce does not preclude application of state inspection laws, unless Congress has occupied the field or the state regulation directly burdens interstate commerce. That neither of these exceptions applies here appears from the description of the operation of the federal and the state laws given below in the opinion of Judge Amidon. Compare *Savage* v. *Jones,* 225 U. S. 501; *Merchants Exchange* v. *Missouri,* 248 U. S. 365; *Corn Products Refining Co.* v. *Eddy,* 249 U. S. 427; *Crescent Cotton Oil Co.* v. *Mississippi,* 257 U. S. 129, and *New York Central R. R. Co.* v. *Winfield,* 244 U. S. 147, 156, note 1. The requirement of a license and the payment of a $10 license fee, if applied to non-residents not regularly engaged in buying grain within the State, might perhaps be obnoxious to the Commerce Clause. But the objection, if sound, would not afford this plaintiff ground for attacking the validity of the statute. *Lee* v. *New Jersey,* 207 U. S. 67. It is a North Dakota corporation, owner of an elevator within the State, and is carrying on business there under the laws of the State as a public warehouseman. Compare *Brass* v. *Stoeser,* 153 U. S. 391, 394, 396. It is possible also that some provision in the license or some regulation issued by the State Inspector is obnoxious to the Commerce Clause. If so a licensee may disregard it. *Cargill Co.* v. *Minnesota,* 180 U. S. 452. Even if the margin clause should be held a burden upon interstate commerce, still that would not invalidate the whole statute. The margin clause is separable from the other pro-

visions of the act; and it could be eliminated without affecting the operation of any other feature of the state system. Compare *Presser* v. *Illinois*, 116 U. S. 252; *Bowman* v. *Continental Oil Co.*, 256 U. S. 642. And it is clear that the Legislature would have wished to secure the protection afforded by the other provisions, if this one should be held to be beyond the power of the State. That it was not the purpose of Congress to supersede state inspection and grading acts is made manifest by § 29 of the United States Grain Standards Act (p. 490). *Merchants Exchange* v. *Missouri, supra,* p. 368.

To strike down this inspection law, instead of limiting the sphere of its operation, seems to me a serious curtailment of the functions of the State and leaves the farmers of North Dakota defenseless against what are asserted to be persistent, palpable frauds.