UNITED STATES v. INDEPENDENT MEAT & POULTRY MARKET, Inc.

No. 8676–b.

District Court, D. New Jersey.

March 30, 1940.

318

John J. Quinn, U. S. Atty., and Charles A. Stanziale, Asst. U. S. Atty., both of Trenton, N. J., for the government.

Sidney Goldmann, of Trenton, N. J., for defendant.

FORMAN, District Judge.

The law under which the information was filed in this case is known as the "Live Poultry Dealers and Handlers Act", 7 U. S.C.A. § 218 et seq., and its purpose is set forth in its preamble as follows: "The handling of the great volume of live poultry required as an article of food for the inhabitants of large centers of population is attendant with various unfair, deceptive, and fraudulent practices and devices, resulting in the producers sustaining sundry losses and receiving prices far below the reasonable value of their live poultry in comparison with prices of other commodities and in unduly and arbitrarily enhancing the cost to the consumers. Such practices and devices are an undue restraint and unjust burden upon interstate commerce and are a matter of such grave concern to the industry and to the public as to make it imperative that steps be taken to free such commerce from such burden and restraint and to protect producers and consumers against such practices and devices." 7 U.S.C.A. § 218.

In sections following, the Secretary of Agriculture is given power to designate cities and markets where unfair practices exist. Persons and firms engaging in certain phases of this commerce are required to be licensed by the Secretary, and provisions are made for the application and issuance of such licenses. A penalty of fine and imprisonment or both is prescribed for a violation of the law, etc.

By order dated October 29, 1935, effective December 12, 1935, the Acting Secretary of Agriculture designated Newark, N. J., as a city, place or market, coming under the provisions of the said law. Under Section 502 of the Order of Designation "no person other than packers * * * shall engage in, furnish, or conduct any service or facility in any such designated city, place or market in connection with the receiving, buying or selling on a commission basis, or otherwise * * * live poultry without a license from the Secretary of Agriculture as herein authorized valid and effective at such time".

Paragraph two of the information in this case charges the defendant with buying live poultry in interstate commerce without the license required under the law on July 19, 1938, from Sam Mazick of Providence, Rhode Island, at a price of $135.89.

Paragraph three charges that the defendant made a similar purchase in Newark, N. J., on July 19, 1938, from Patsy Bosco of Brooklyn, N. Y., at a price of $20.25.

Paragraph four charges another purchase in Newark, N. J. on August 30, 1938, from Sam Mazick of Providence, Rhode Island, at a price of $208.40.

Lastly, paragraph five charges purchases in Newark, N. J., from numerous persons from the States of Rhode Island, Delaware, New York and Virginia, these purchases being made on July 19, 1938.

On the trial the government abandoned the allegation in so far as the purchase from Patsy Bosco was concerned as described in the third paragraph of the information, and claimed the right under the fifth paragraph, or blanket allegation, to prove that defendant had purchased live poultry from a producer in Delaware and one in Virginia. Defendant waived the vagueness of the charge contained in the latter paragraph, and agreed to permit the government to submit proof of such purchases from the producers if it could do so.

It is to be noted that the government specifically charged in its information that defendant purchased live poultry from sources outside New Jersey. It carefully avoided any charge that defendant purchased its live poultry from Gabriel Ferranti, Inc., of Newark, N. J. In fact, that

name does not appear anywhere in the information.

The case was tried to the court, the defendant having waived a jury. The proofs show that the defendant, Independent Meat and Poultry Market, Inc., is a "one-man" corporation in the person of Samuel Katz. It is a retailer of poultry doing business in the City of Newark, N. J. At the time of the alleged violations it was without a license as contemplated by the act. It purchased the poultry in question from the firm of Gabriel Ferranti, Inc., a wholesale poultry dealer in the City of Newark, N. J. Gabriel Ferranti, Inc., purchased poultry from Sam Mazick, of Providence, Rhode Island, and other persons from states other than New Jersey, and placed them upon the floor of its market. There was no label or other indication upon the poultry to show their source, and the defendant bought from Gabriel Ferranti, Inc., in Newark, N. J., without knowledge of their origin.

The government seeks to give the impression that Gabriel Ferranti, Inc., sold some of this poultry to the defendant on a commission basis for the accounts of out-of-state producers, but its own witnesses failed to substantiate any such contention, as is shown by the testimony of Mr. Greenstein, bookkeeper and in charge of records of Gabriel Ferranti, Inc., as follows:

"Question. When Mr. Ferranti bought these chickens from Mazick, the July 19th chickens sold to Independent, did Mr. Ferranti and his partner or the Ferranti Company buy those outright or on commission? Answer. Most of the merchandise—

"The Court. Not most of the merchandise.

"Question. That day. Answer. Those items were bought.

"Question. Outright? Answer. Yes.

"Question. August 30th,[1] the purchase there, what about the West purchase? [of Delaware] Answer. That was bought.

"Question. Outright? Answer. Outright.

"Question. By Ferranti? Answer. Yes.

"Question. For his own account? Answer. That is right.

"Question. What about the chickens bought on August 27th[1] from Roanoke, Virginia? Answer. They were bought.

"Question. Outright? Answer. Yes.

"Question. On Ferranti's account? Answer. That is right.

"Question. What about the August 30th chickens from Mazick, part of which you say were sold to Independent? Answer. They were bought.

"Question. So that in none of these cases was there a commission arrangement through Ferranti Brothers? Answer. Not on these."

This was corroborated by Mr. Ferranti, president of his corporation, another government witness, who like Mr. Greenstein, said that although their firm did some commission business the greater portion was in outright purchase of poultry from producers and its subsequent sale to retailers or others.

The government persists in the contention that the defendant is an agency rendering a facility or service within the contemplation of the act, and having made the purchases albeit they were outright purchases in Newark, N. J., its failure to have a license was a violation of the law.

The defendant contends that the failure of the government to substantiate by proof the allegations of the information that defendant purchased poultry from sources out of the State of New Jersey, and its affirmative showing that the defendant purchased from Gabriel Ferranti, Inc., within the State of New Jersey, is a fatal variance, and thereby entitles it to a dismissal of the information.

It also contends that since the purchases by the defendant were not from sources outside the State of New Jersey, they were not in interstate commerce, and though the defendant was without a license when they were made, such purchases did not constitute a violation of the law.

■ There is no question but that the proofs offered by the government varied from the allegations in the indictment in a material manner. The government knew that the transactions involved occurred between the defendant and Gabriel Ferranti, Inc., but preferred to frame its charges without disclosing this to the defendant. Moreover, the fifth paragraph contains such general language as to make its charges vague and obscure. This was a criminal complaint, and the defendant was entitled to know with reasonable detail the

---

[1] These transactions were introduced in evidence under the blanket allegation contained in paragraph five of the information.

important elements concerned in the violation of the law with which it was being charged. There should have been a plain, frank statement of its acts so that it could adequately prepare to meet them. The information may well be dismissed alone on the objection that it failed in these respects.

However, the matter was given full hearing and since a wider and more significant issue is raised, a ruling upon the mere defectiveness of the pleading might provoke only a re-institution of the proceedings, and cause a duplication of the expense of effort and time of all parties concerned. Therefore, the case will be considered in its wider scope so that it may receive final disposition in this court.

■ The question raised concerns the right of the government to extend under this law and its interstate commerce jurisdiction its regulations over transactions in live poultry consummated in the City of Newark, N. J., under the facts of this case.

The government compares the position of Gabriel Ferranti, Inc., with that of the stockyards of the Mid-west through which cattle of the West pass to the consumers of the East. Swift & Company v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; and Tagg Bros. v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L.Ed. 524. In Swift & Company v. United States, 196 U.S. 375, 398, 399, 25 S.Ct. 276, 280, 49 L.Ed. 518, the court stated: "When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce."

Analogy is likewise made with the case of Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458, in which a North Dakota Association purchased grain in that State and deposited it in elevators to be shipped to other states. Although the grain could be diverted locally, it was held that the business of the Association was of an interstate character.

The government also compares this case with that of Binderup v. Pathé Exchange, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308, in which motion picture films were shipped by the lessors in New York to their agents in Nebraska for distribution to lessees in Nebraska. It was held that this constituted interstate commerce even though the agents were intermediaries between the lessors and lessees.

In the case of Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, the defendants were engaged in the business of slaughtering chickens and selling them to retailers. They bought their fowl from commission men in a market where most of the supply was shipped in from other states, transported them to their slaughter houses, and there held them for slaughter and local sale to retail dealers and butchers, who in turn sold directly to consumers. The court held that the transactions of defendants were not in interstate commerce. It said:

"Were these transactions 'in' interstate commerce? Much is made of the fact that almost all the poultry coming to New York is sent there from other states. But the code provisions, as here applied, do not concern the transportation of the poultry from other states to New York, or the transactions of the commission men or others to whom it is consigned, or the sales made by such consignees to defendants. When defendants had made their purchases, whether at the West Washington Market in New York City or at the railroad terminals serving the city, or elsewhere, the poultry was trucked to their slaughterhouses in Brooklyn for local disposition. The interstate transactions in relation to that poultry then ended. Defendants held the poultry at their slaughterhouse markets for slaughter and local sale to retail dealers and butchers who in turn sold directly to consumers. Neither the slaughtering nor the sales by defendants were transactions in interstate commerce. Brown v. Houston, 114 U.S. 622, 632, 633, 5 S.Ct. 1091, 29 L.Ed. 257; Public Utilities Comm. v. Landon, 249 U.S. 236, 245, 39 S.Ct. 268, 63 L.Ed. 577; Industrial Association v. United States, 268 U.S. 64, 78, 79, 45 S.Ct. 403, 69 L.Ed. 849; Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 267, 48 S.Ct. 107, 72 L.Ed. 270.

"The undisputed facts thus afford no warrant for the argument that the poultry handled by defendants at their slaughterhouse markets was in a 'current' or 'flow' of interstate commerce, and was thus sub-

ject to congressional regulation. The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within the state and is there held solely for local disposition and use. So far as the poultry here in question is concerned, the flow in interstate commerce had ceased. The poultry had come to a permanent rest within the state. It was not held, used, or sold by defendants in relation to any further transactions in interstate commerce and was not destined for transportation to other states  Hence decisions which deal with a stream of interstate commerce—where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here. See Swift & Co. v. United States, 196 U.S. 375, 387, 388, 25 S.Ct. 276, 49 L.Ed. 518; Lemke v. Farmers' Grain Co., 258 U.S. 50, 55, 42 S.Ct. 244, 66 L.Ed. 458; Stafford v. Wallace, 258 U.S. 495, 519, 42 S.Ct. 397, 66 L. Ed. 735, 23 A.L.R. 229; Chicago Board of Trade v. Olsen, 262 U.S. 1, 35, 43 S.Ct. 470, 67 L.Ed. 839; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 439, 50 S.Ct. 220, 74 L.Ed. 524." 295 U.S. 495, 542–544, 55 S.Ct. 837 · 848, 79 L.Ed. 1570, 97 A.L.R. 947.

The court, it is noted, distinguished Swift & Company v. United States, etc., to which may be added the analogous cases cited by defendant, and we think that distinction is controlling here. We cannot agree that the business of Gabriel Ferranti, Inc., is on a parallel with that of the business of the stockyards, grain elevators, and film distributors. The non-resident producer of the poultry involved herein was not concerned with the distribution of the poultry beyond Gabriel Ferranti, Inc. Atlantic Coast Line R. Co. v. Standard Oil Co., 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270. In fact, the poultry had come to rest at that point. Public Utilities Commission v. Landon, 249 U.S. 236, 39 S.Ct. 268, 63 L.Ed. 577; Industrial Ass'n v. United States, 268 U.S. 64, 45 S.Ct. 403, 69 L.Ed. 849. Succeeding transactions were of an intrastate character.

We conclude that Gabriel Ferranti, Inc., was the outright purchaser of the poultry involved from the out-of-state producers. It sold poultry to the defendant in New Jersey which constitutes intrastate commerce only. The defendant is acquitted of the charges contained in the information.