CHASSANOIL v. CITY OF GREENWOOD.

SABIN v. SAME.

(En Banc. May 6, 1933. Suggestion of Error Overruled June 12, 1933.)

[148 So. 781. Nos. 30494, 30495.]

See, also, 144 So. 548.

**Ward Allen,** of Greenwood, for appellants.

E. W. Smith, of Clarksdale, amicus curiae.

Green, Green & Jackson, of Jackson, amici curiae.

Somerville & Somerville, of Cleveland, amici curiae.

A. H. Bell and W. S. Vardaman, Jr., both of Green-wood, for appellee.

854

**J. A. Lauderdale**, Assistant Attorney-General, for appellee.

Argued orally by **Ward Allen** and **E. W. Smith**, for appellant, and by **Bob Somerville, J. A. Lauderdale**, and **A. H. Bell**, for appellee.

**Ethridge, J.**, delivered the opinion of the court.

These two cases were separately appealed from the circuit court of Leflore county, and involve the constitutionality of certain provisions of chapter 88, Laws of 1930, and chapter 89, Laws of 1932. Section 55, of chapter 88, Laws of 1930, imposes a privilege tax of twenty-five dollars upon each cotton broker who buys and sells cotton, not licensed as a cotton buyer; section 56 imposes a privilege tax of one hundred dollars upon every person buying and selling cotton for himself; while section 58 imposes a tax of twenty-five dollars on each cotton factor or merchant who receives cotton on consignment for sale.

Section 61, chapter 89, Laws of 1932, imposes a tax of twenty-five dollars on each cotton broker or agent engaged in buying and selling cotton, not licensed as a cotton buyer; section 62 imposes a tax of twenty-five dollars on every person engaged in buying and selling cotton; section 64 imposes a tax of twenty-five dollars on each factor or merchant receiving cotton on consignment for sale on which he charges a commission.

The city of Greenwood, under the statute authorizing it

to do so, levied a municipal privilege tax of fifty dollars on persons selling and buying cotton, and each of the appellants paid to the city said tax, Sabin having paid without protest, and Chassanoil paid said tax under protest.

Afterwards, the said parties petitioned the city for refund of the amounts so paid, aggregating above fifty dollars in each case. The application for a refund was made under the provisions of section 2591, Code 1930.

The city of Greenwood denied a refund, and there was an appeal, from the order of the city denying same, to the circuit court, and, after a full hearing, the circuit court also denied the application for refunds to these parties.

By agreement between the city of Greenwood and the appellants, the petition presented to the city authorities was treated as stating the facts. This petition recited that the appellants, Chassanoil and Sabin, were engaged in Greenwood, Mississippi, from September 1, 1931, to September 1, 1932, in the business of cotton buyers and sellers; that on June 3, 1930, the municipality adopted an ordinance levying upon said business an annual privilege tax of fifty dollars in each case, and, under the color of said ordinance, required appellants to pay for the privilege of conducting this business for one year, as evidenced by receipts. In one case, as above stated, payment was made under protest, and, in the other, without protest. On September 1, 1932, the municipality required the appellants to pay said tax. It was further recited that the Mississippi Delta, composed of alluvial soil, comprises about six thousand six hundred fifty square miles, and is peculiarly adaptable to grow what what is known as ''Delta-Type, long staple cotton,'' recognized throughout the world as being of a superior type, strength, and character; that the city of Greenwood is located in the Mississippi Delta, which is exclusively an agricultural community, the principal crop of which is

long staple cotton, producing, approximately, seven hundred thousand bales, which is more than forty per cent. of the total cotton crop in Mississippi. That said cotton is sold upon the open market and constitutes the principal revenue of the entire Delta. It is further recited that by the uniform and general custom bales of cotton are transported by rail or otherwise to compresses; that a compress is a combination storage warehouse and compress; and that approximately thirty per cent of the cotton bought and sold upon said market in Greenwood is transported to the compress by automobile, truck, or wagon, and approximately seventy per cent. is transported to said compresses by rail, or common carriers engaged in interstate commerce; that there are three compresses in Greenwood, all of which comply with all of the terms and provisions of the United States Warehouse Act, chapter 10, title 7 U. S. C. A. (section 241 et seq.), and that cotton is stored and handled therein for interstate and foreign commerce. That when cotton is delivered to the compresses it is graded and classed by persons licensed as classers by the United States Department of Agriculture, unless such grading and classing is waived by the owner. That there is an active market for the sale and purchase of cotton at Greenwood between the farmers raising the cotton and those purchasing same with the invariable intention and purpose of selling and transporting same in interstate and foreign commerce, and that this has been the universal custom for more than twenty years. The price upon which said cotton is sold is determined by the value of said cotton at certain exchanges in New Orleans, New York, and Liverpool, England, and there are brokers in Greenwood who receive daily by wire quotations from said exchanges fixing and determining the price of cotton at Greenwood. All of said cotton, however, is bought with the uniform purpose to transport same in interstate and foreign commerce to cotton mills located in Georgia, South and North Carolina, and Tennessee, and the New

England states, none of said cotton being spun or utilized within the confines of Mississippi. It is further recited that, when the destination of said cotton is determined, the said carriers load it out on shipping instructions of the owner, and charge the through freight rate from the point of origin to the point of destination, instead of charging the combined rate for carriage in intrastate commerce from the point of origin to Greenwood, plus the charge for carriage in interstate commerce from Greenwood to the point of destination. That some growers ship all of their cotton to the compresses by rail, others transport by truck, automobile, or wagon, while still others ship a portion by rail and the remainder by truck, automobile, or wagon; and that the buyer purchases or handles cotton indiscriminately, however transported, but, in order to buy, they are compelled to buy some cotton transported by truck or wagon for the reason that such purchases are necessary to fill out and complete orders. It is recited that warehouse receipts are issued by compresses to growers or factors, and that in Greenwood there are a number of such factors, and the cotton is sold to the buyers and shippers upon the basis disclosed by the samples of said cotton and by the indorsement and delivery of the warehouse receipts evidencing the ownership of the cotton. It is then recited that the uniform custom among buyers, shippers, and sellers is that the buyer enters into a contract for either the future or immediate delivery of a certain number of bales of cotton of a certain grade, and staple, obligating himself to deliver to a mill in a foreign state or country such cotton at a given price, and that, thereupon, such buyer will go upon said market at Greenwood and purchase cotton of the kind which he is obligated to deliver to his customer, and will cause the delivery of said cotton in interstate or foreign commerce; that a very small proportion of the cotton purchased by shippers (not exceeding ten per cent.), is bought when no contract for sale therefor

exists; but, in such cases, it is bought with the sole anticipation and intention to procure a sale thereof to a foreign cotton mill or foreign cotton merchant and to cause the same to be transported in interstate or foreign commerce, for the purpose of filling specific contracts with mills located in foreign states and in foreign countries. That the buyer cannot fill his orders without buying lots of cotton in their entirety because growers will sell no other way, and that, thereby, buyers accumulate small stocks of cotton, not exceeding ten per cent. of the amount they handle, being only a necessary incident to and concomitant of those purchases which are made for the purpose of filling specific contracts.

The constitutionality of the act in question, and of the ordinance of the city of Greenwood, depends upon the construction placed upon the enactment of the statute by the Legislature.

It has long been settled in this state that, in construing a statute, a construction will be placed upon it, if reasonably possible, to render it constitutional and to carry out the purpose of the Legislature. It is well known to experienced lawyers, and to the Legislature, that the state has no power to tax interstate commerce; that is, it has no power to impose a tax on the right to engage in interstate commerce. Statutes must be construed then to reflect the evident and manifest purpose of the Legislature to tax intrastate commerce, and not to levy a tax upon that which they have no constitutional power to tax. Many years ago, this court, in Pullman Co. v. Adams, Rev. Agt., 78 Miss. 814, 30 So. 757, 84 Am. St. Rep. 647, held that the Code of 1892, section 3387, authorizing a privilege tax on each sleeping car of one hundred dollars, and in addition a tax of twenty-five cents a mile for each mile of railroad over which it runs, affected only the business done in the state, and was not unconstitutional as interfering with interstate commerce. That, under this statute, the company could not take out

a license or pay a tax for doing interstate business, and that the statute was valid.

This case was a stronger case for holding that interstate business is not taxable than the one we have before us, because section 195 of the Constitution declares that sleeping cars are common carriers. In that case, in the Mississippi report, vol. 78, page 829, 30 So. 757, 84 Am. St. Rep. 647, Judge Whitfield, speaking for the court, said: ''The whole purpose of this statute, from its terms, manifestly is to require a privilege tax to be paid for doing business within this state, and for that business alone. It relates exclusively to the local business done by the Pullman Company within this state. It does not require any tax to be paid for the privilege of doing the interstate business of the company. It does not in any manner affect its interstate business. 'It can conduct its interstate business without paying the slightest heed to the act, because it does not apply to or in any degree affect the company in regard to that portion of its business which it has the right to conduct without regulation from the state' ''—citing Osborne v. Florida, 164 U. S. 650, 17 S. Ct. 214, 41 L. Ed. 586, as decisive of this case. The case of Pullman v. Adams, supra, was appealed to the Supreme Court of the United States, and is reported in 189 U. S. 420, 23 S. Ct. 494, 47 L. Ed. 877.

Our court had occasion later to construe another statute levying a privilege tax upon railroads engaged in intrastate commerce. See N. O., M. & C. R. R. Co. v. State, 110 Miss. 290, 70 So. 355, 358. This case involved the imposition, by chapter 102, Laws 1912, of a tax, and the court held that the privilege tax there imposed was for doing purely intrastate business, saying as follows: ''The tax for the privilege of doing business in Mississippi is upon the mileage of railroads in Mississippi, and not only is this true, but the Legislature, in an apparent effort to be reasonable, has fixed the maximum rate per mile, and consequently a maximum amount be-

yond which the tax in no case could run. In this regard, it falls within the principle announced by the Supreme Court of the United States in Baltic Mining Co. v. Massachusetts, 231 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127, as follows: 'So, if the tax is, as we hold it to be, levied upon legitimate subject of such taxation, it is not void because imposed upon property beyond the state's jurisdiction, for the property itself is not taxed. In so far as it is represented in the authorized capital stock, it is used only as a measure of taxation, and, as we have seen, such measure may be found in property or in the receipts from property not in themselves taxable.' '' On page 305 of 110 Miss., 70 So. 355, 360, the court said: ''We cannot give to general provisions of any statute a meaning that would lead to absurdity or that would convict the Legislature of attempting to deal with a subject clearly beyond its jurisdiction. The spirit and reason of the law certainly prevail over the strict letter. Furthermore, there is room for applying the words 'gross earnings' in this statute to the gross earnings derived from the intrastate business, and not to the gross earnings of the entire system of an interstate railroad.''

These cases cited were decided by this court many years ago, and the Legislature must have been familiar therewith, and must have relied upon them in the use of the general language it used. This rule of construction is perfectly sound, and we are sure that it was the purpose of the Legislature to limit the tax here imposed upon intrastate commerce.

In passing upon the constitutionality of a statute, we cannot accept as binding agreements that are merely conclusions from facts, nor can we accept the understanding of the parties litigant as to the general course of business dealing. These agreements may suffice to settle the rights of the parties between themselves, but they cannot overturn the statutes. The Legislature has facilities and opportunities for knowing business customs and

conditions within the state. There is, in fact, much buying and selling of cotton in this state that is, in no sense, interstate commerce, and the Legislature knew this to be true. Cotton is a great commodity of this state and is bought and sold by people engaged in intrastate business to a considerable degree, at a considerable profit. The state raises a considerable revenue from the privilege taxes. The activities of the state and its subordinate divisions are vastly important, and, in recent years, the state has been forced to schemes of taxation to raise revenue that formerly did not exist. But, through many years, the privilege taxes have constituted an important element of the state's revenue system.

Under the agreed facts, there is a considerable portion of cotton business at Greenwood that is intrastate, rather than interstate, commerce. It is agreed that thirty per cent. of the cotton brought into Greenwood and stored there is brought in by trucks, automobiles, and wagons, and not placed in interstate commerce at the time it is stored in the warehouses, nor, in any sense, consigned to any person for shipment in interstate commerce when sales are made. The Supreme Court of the United States has held as to cotton so stored that it does not become a part of interstate commerce. The beginning of interstate commerce is the time when the goods begin their interstate journey, thus passing beyond the state's authority into domestic or federal control. Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 60 L. Ed. 458; Schafer v. Farmers' Grain Co., 268 U. S. 189, 45 S. Ct. 481, 69 L. Ed. 909; General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754; McCluskey v. Marysville & N. R. Co., 243 U. S. 36, 37 S. Ct. 374, 61 L. Ed. 579; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724.

The essential character of commerce, not the accident of through bills of lading, is its continuity of movement

in foreign commerce, and that determines federal or state control over it. And it takes character as interstate or foreign commerce when it is actually started in the course of transportation to another state or to a foreign country. R. R. Commission v. Texas & P. R. Co., 229 U. S. 336, 33 S. Ct. 837, 57 L. Ed. 1215. See, also, I. C. R. R. Co. v. DeFuentes, 236 U. S. 157, 35 S. Ct. 275, 59 L. Ed. 517, and R. R. Com. of Ohio v. Worthington, 225 U. S. 101, 32 S. Ct. 653, 56 L. Ed. 1004.

In the case of Superior Oil Co. v. Mississippi, 280 U. S. 390, 50 S. Ct. 169, 74 L. Ed. 504, 507, it was held that the sale of gasoline was not converted into an interstate transaction, so as to render inapplicable a state gasoline sales tax, by the fact that the gasoline is transported on boats operated by the purchaser into another state, for resale there, under a so-called bill of lading, naming the purchaser as consignee and reciting that the gasoline should remain the property of the seller until delivered to consignee or his agent at the point of destination, since it was optional with the purchaser whether he would carry it out of the state or not.

In the case before us, as to the thirty per cent. that is transported by trucks and wagons or other private conveyances and placed in storage in Greenwood, and not consigned to any one outside the state, nor sold to any one outside the state, the property is not in interstate commerce. The owner might withdraw it, or sell it, whenever he pleases.

The transaction is to be determined by its facts, and not by a fantastic and far-fetched consideration.

In the case of Superior Oil Co. v. Mississippi, 280 U. S. 390, 393, 50 S. Ct. 169, 170, 74 L. Ed. 504, 507, in the course of the opinion, the court said: "The document hardly can affect the case, because it is 'not within the power of the parties by the form of their contract to convert what was exclusively a local business, subject to state control, into an interstate commerce business,

protected by the commerce clause;' Browning v. Waycross, 233 U. S. 16, 23, 58 L. Ed. 828, 34 S. Ct. 578, 580; at least when the contract achieves nothing else. The importance of the commerce clause to the Union of course is very great. But it also is important to prevent that clause being used to deprive the states of their lifeblood by a strained interpretation of facts."

In the case of Lawrence v. State Tax Commission, 286 U. S. 276, 52 S. Ct. 556, 76 L. Ed. 1102, the Supreme Court of the United States held that the Federal Constitution, apart from the specific grant to the federal government of the exclusive power to levy certain limited classes of taxes and to regulate interstate and foreign commerce, leaves the states unrestricted in their power to tax those domiciled within them, so long as the tax imposed is upon property within the state, or on privileges enjoyed there, and is not so palpably arbitrary or unreasonable as to infringe the Fourteenth Amendment. It is true that this case did not involve a privilege tax, but an income tax; however, the principle that the state can levy taxes on privileges enjoyed therein is applicable here where the transaction applies, as we hold it does, to intrastate business alone. See State ex rel. Knox v. G. M. & N. R. Co., 138 Miss. 70, 104 So. 689; Coe v. Erroll, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Carson Petroleum Co. v. Vial, 279 U. S. 95, 49 S. Ct. 292, 73 L. Ed. 626; Nashville, C. & St. L. R. Co. v. Wallace, 288 U. S. 249, 53 S. Ct. 345, 77 L. Ed. —.

The appellants rely strongly upon the case of Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139, but in that case the general language of the statute had not been interpreted by the state court so as to limit the privilege tax there enacted to intrastate commerce. The court, in the absence of a construction by the state court, held that the general language covered both intrastate and interstate commerce, and that the act was not acceptable.

The meaning of a statute is for the determination of a state court, and the federal courts are bound by the construction of the state court. Anglo-Chilean Nitrate Sales Corp. v. State of Ala., 288 U. S. 218, 53 S. Ct. 373, 77 L. Ed. —. See U. S. Dig. (L. Coop. Co.) "Courts," sec. 789. Our construction accords with former decisions of our own state upon the construction of statutes.

The Lemke and Shafer Cases (the Dakota grain cases), supra, relied upon by the appellants, are easily differ-. entiated from the case before us. In those cases the state law undertook to place certain requirements on grain shipments, and thus imposed stringent regulations calculated to embarrass and impede the shipment of grain from the state.

The cases relied upon by the appellants can all be differentiated from the case before us. It does not matter whether the intrastate business done was nearly equal to the interstate business, the state's control over the intrastate business is full and complete, subject only to the provisions of the Federal Constitution. The powers of the state, not given to the United States government by the Federal Construction, are reserved to the state or the people. The state constitutes an essential unit in the federal scheme, and the state should not be embarrassed in the operation of its functions within its sphere, but should be left to discharge those functions according to its ¡own¡ conception 'thereof. This nation, as it was founded, cannot exist without the states, fulfilling their proper functions in the scheme. The importance of the powers and rights of the states have not been magnified, and have been frequently overlooked. The power of the state is not restricted except by the Federal Constitution or the state Constitution.

That which is inherent in intrastate commerce does not lose its essential nature when it becomes a part of transactions in interstate commerce. York Mfg. Co. v.

Colley, 247 U. S. 21, 38 S. Ct. 430, 62 L. Ed. 963, 11 A. L. R. 611.

The constitutional equality of the states is essential to the harmonious operation of the scheme upon which the republic was organized. This country is an indestructible union of indestructible states. Coyle v. Smith, 221 U. S. 559, 31 S. Ct. 688, 55 L. Ed. 853; White v. Hart et al., 13 Wall. (80 U. S.) 646, 20 L. Ed. 685. In Texas v. White, 7 Wall. 700, 19 L. Ed. 227, it was held that, if a state would exercise its sovereign power, then it must be permitted to exercise its legitimate power in all legitimate ways.

When considered in the light of these authorities, the agreement entered into between the city of Greenwood and the appellants does not, on its facts, make a case which taxes interstate commerce. If the court should make mistakes in applying the state law as to what interstate commerce is, it does not affect the statute before us. The intention of the Legislature was not to tax interstate commerce, and whether administrative officers or judicial bodies err in determining a particular transaction not to be interstate commerce does not affect the statute itself, but only involves a misapplication of the statute.

We find no reversible error, and the judgment will be affirmed.

Affirmed.

**Anderson, J.,** delivered a dissenting opinion.

The facts of these cases were not agreed to, but are not in dispute. Appellee offered no evidence at the conclusion of appellants' but agreed that appellants' petition for the refund of the taxes, and the exhibits thereto, should be admitted in evidence. This was done and constituted all the evidence in the case.

The outstanding and controlling facts are that all the

long staple cotton produced in this state ultimately goes into interstate commerce, none of it is manufactured within the borders of the state. The long staple cotton produced in the Greenwood territory is concentrated at three compresses in Greenwood for the purposes of compression, sale, and shipment in interstate commerce. Appellants and other cotton buyers at Greenwood purchase the cotton from the producers and merchants who own it to fill contracts of sale theretofore made by them to mills and other buyers in other states and foreign countries; in doing so, they are forced to purchase something like an average of ten per cent. more cotton than is necessary to fill their contracts. This results from the fact that the owners of the cotton are not willing to split their sales so as to meet the requirements of the purchasers as to number of bales, class, and grade. This overage of ten per cent. is sold by the buyers in the local market at Greenwood; it is generally purchased by other buyers to fill foreign contracts. The result is that ninety per cent. of the cotton purchased by appellants and other cotton buyers at Greenwood is purchased to fill foreign contracts of sale, and the balance of ten per cent is sold by them locally, as above stated. The facts demonstrate that the foreign business cannot be carried on without, at the same time, conducting the local business. That is true because they are so integrated into each other as to be inseparable.

The city of Greenwood, as it was authorized to do by statute, passed an ordinance, the provisions of which are indicated by its title in this language: "An ordinance levying an annual tax on privileges conducted within the limits of the municipality known as the city of Greenwood to an amount equal to fifty per centum of the annual tax imposed on such privileges by the state of Mississippi under chapter 88 of the Laws of Mississippi for 1930, and providing penalties." By section 3 of the ordinance, section 225 of chapter 88 of the Laws of 1930

was adopted. This action by the municipality was authorized by section 2549, Code 1930, which provides, in substance, that all offenses under the penal laws of the state which are misdemeanors shall, when so provided by general ordinance of the municipality, be offenses against the municipality when committed within its corporate limits, and upon conviction thereof the same punishment shall be imposed by the municipality as is provided by the laws of the state with regard to such offenses against the state, but not in excess of the maximum penalty which may be imposed by municipal corporations.

Section 3 of the ordinance is in this language: "All persons liable for privilege taxes who shall fail to procure the license therefor before beginning the business for which a privilege tax is required by the terms of this ordinance, or who shall fail to renew during the month in which it is due the license on a business for which he has theretofore procured a privilege license, shall in each or either instance, be liable for double the amount of the tax required for such business and it is hereby made the duty of the city tax collector whose duty it is to collect the tax on such business, to collect the said tax penalties, issue a separate license for the tax for the penalty, and to endorse across the face of the license issued as a penalty the words 'Collected as Damages,' and the said tax collector shall account for all such penalties as required to account for other privilege licenses, provided, however, that the provisions of this ordinance shall not be construed as infringing upon any statutory power of any state officer to collect due and unpaid licenses as now or may be provided for by the laws of the state of Mississippi. In addition to the hereinabove described penalty the delinquent tax payer shall be guilty of a misdemeanor and may be fined on conviction an amount not exceeding Fifty Dollars ($50.00)."

Before getting down to the exact question involved it

would be very well to have in mind the surrounding principles as declared by the Supreme Court of the United States. A product may be a part of interstate commerce before it begins its actual physical journey therein. Where goods are purchased in one state for transportation to another, the purchase is interstate commerce quite as much as the transportation. Dahnke-Walker Milling Co. v. Bondurant, 257 U. S. 282, 42 S. Ct. 106, 66 L. Ed. 239. The buying and selling of goods for shipment beyond state lines is interstate commerce, notwithstanding that after the purchase some of the goods may be sold in local markets. Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458. The carrying of goods from one state to another, as the result of orders previously received from the originating state, is interstate commerce, and is not subject to license fees imposed by the state into which they are shipped. Wagner v. Covington, 251 U. S. 95, 40 S. Ct. 93, 64 L. Ed. 157. The buying of grain in one state for shipment to markets in another state, if followed by such shipment, is interstate commerce. Shafer v. Farmers' Grain Co., 268 U. S. 189, 45 S. Ct. 481, 69 L. Ed. 909. The negotiation for the sale of goods which are in another state for the purpose of introducing them into the state into which the negotiation is made is interstate commerce. Crenshaw v. Ark., 227 U. S. 389, 33 S. Ct. 294, 57 L. Ed. 565; Weeks v. U. S., 245 U. S. 618, 38 S. Ct. 219, 62 L. Ed. 513. The sale and delivery of coal f. o. b. cars at the mine for transportation to purchasers in other states is interstate commerce. Pa. R. Co. v. Sonman Shaft Coal Co., 242 U. S. 120, 37 Sup. Ct. 46, 61 L. Ed. 188. The right to solicit or take orders for interstate commerce business is a part of interstate commerce, and not subject to state regulation. Vance v. W. A. Vandercook Co., 170 U. S. 438, 18 S. Ct. 674, 42 L. Ed. 1100. Where a commodity is a part of an actual constant and flowing stream out of a state from which the owner may draw part of it for

use in the state before reaching the state border, a tax on the flow is a burden on interstate commerce which the state cannot impose. Such a flow in interstate commerce is a reasonable class of business. Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229. A tax on flowing commerce does not become valid and constitutional because it applies to domestic commerce as well. Crew-Levick Co. v. Pa., 245 U. S. 292, 38 S. Ct. 126, 62 L. Ed. 295. A person cannot be required to pay a state line tax for the mere privilege of carrying on interstate or foreign commerce. City of Sault Ste. Marie v. International Transit Co., 234 U. S. 333, 34 S. Ct. 826, 58 L. Ed. 1337, 52 L. R. A. (N. S.) 574; Crutcher v. Ky., 141 U. S. 47, 11 S. Ct. 851, 35 L. Ed. 649.

Now coming directly to the question involved, the case of Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 608, 65 L. Ed. 1139, is decisive of the question—it is squarely in point. The principles there laid down govern; there is no escape. The ordinance in question imposes an unconstitutional burden on interstate commerce. A statute of the state of New Mexico imposed an excise tax of two cents for each gallon of gasoline sold or used, and an annual license tax of fifty dollars for each distributing station or place of business. The Continental Oil Company was engaged in both domestic and interstate business; ninety-four and five tenth per cent. of its business was intrastate, and the balance, five and five tenth per cent., was interstate. The Supreme Court held the gallonage tax of two cents valid as to domestic business and invalid as to interstate business, basing its decision, as I understand it, upon the ground that the two classes of business were separable—one could be carried on without the other. However, as to the privilege license of fifty dollars, the court held that the two classes of business could not be separated; that by the terms of the statute and its legal operation and effect this tax was imposed generally upon the entire business conducted, in-

cluding interstate commerce as well as domestic; and that the tax was therefore void. The court used this language in deciding the case:

"The act, in its second section, requires every distributor of gasoline to pay an annual license tax of fifty dollars for each distributing station or place of business or agency, requires it to be paid in advance, and renders it unlawful to carry on the business without having paid it. Section 8 declares that any person who shall engage or continue in the business of selling gasoline without a license shall be deemed guilty of a misdemeanor, and, upon conviction, be punished by fine or imprisonment, or both. The subject taxed is not in its nature divisible, as in the case of the excise tax. The imposition falls upon the entire business indiscriminately; and so does the prohibition against the further conduct of business without making the payment. By accepted canons of construction, the provisions of the act in respect of this tax are not capable of separation so as to confine them to domestic trade, leaving interstate commerce exempt. United States v. Reese, 92 U. S. 214, 221, 23 L. Ed. 563, 565; Trade-Mark Cases, 100 U. S. 82, 99, 25 L. Ed. 550, 553; Poindexter v. Greenhow, 114 U. S. 270, 304, 305, 330, 5 S. Ct. 903, 962, 29 L. Ed. 185, 197, 198, 207; Pollock v. Farmers' Loan & T. Co., 158 U. S. 601, 636, 15 S. Ct. 912, 39 L. Ed. 1108, 1125.

"No doubt the state might impose a license tax upon the distribution and sale of gasoline in domestic commerce if it did not make its payment a condition of carrying on interstate or foreign commerce. But the state has not done this by any act of legislation. Its executive and administrative officials have disavowed a purpose to exact payment of the license tax for the privilege of carrying on interstate commerce. But the difficulty is that, since plaintiff, so far as appears, necessarily conducts its interstate and domestic commerce in gasoline indiscriminately at the same stations and by the same agencies,

the license tax cannot be enforced at all without interfering with interstate commerce unless it be enforced otherwise than as prescribed by the statute—that is to say, without authority of law. Hence it cannot be enforced at all.''

The ordinance of the city of Greenwood, as did the New Mexico statute, requires the payment of the license tax in advance, renders it unlawful to carry on the business without the payment of the tax, and provides that any person engaging in the business without obtaining the license is guilty of a misdemeanor, and on conviction subject to fine and imprisonment, or both, and in addition provides that he shall pay double the amount of the tax required.

Lemke v. Farmers' Grain Co., 258 U. S. 50, 42 S. Ct. 244, 66 L. Ed. 458, also strongly supports the contention of appellants. It was held in that case that the business of buying grain in North Dakota, practically all of which was intended for shipment to and sale at terminal points in other states conformable to the usual and general course of business in the grain trade, was interstate commerce which a state could not regulate by a statute having the effect of burdening such commerce. The court held further that the essential feature of a state statute could not be eliminated by the courts for the purpose of saving the constitutionality of other parts of the statute.

The cases referred to and relied on in the majority opinion to sustain the legality of this tax are not in point, for in each of those cases the domestic and interstate business were separable, and the tax imposed, therefore, could be and was allocated to the domestic business, and left the interstate business untouched. That is not true of the tax here. The two classes of business are inseparable; the foreign commerce could not be carried on without the domestic business; the latter was a concomitant. The tax cannot be laid alone against the domestic business—the overage of ten per cent.—for in taxing that

the interstate business is necessarily taxed, for the simple reason that it cannot be carried on without this overage. In other words, under the facts in this case, the overage is as much a part of the interstate commerce as the ninety per cent. Appellants had the right, and did everything in their power, to carry on interstate commerce exclusively, but under the conditions existing they could not do so without carrying along this overage of ten per cent. This being true, the state could not tax one without taxing the other. If the state could reach down into the stream of interstate commerce and dip out the domestic business for state regulation without hampering the free flow of the stream, its regulation would be valid. On the other hand, if the separation of the domestic business from the foreign would interfere with the free flow of the stream, the action of the state would be illegal.